# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## 2014-1378

Frank M. Weyer and Troy K. Javaher,

Patent Owners - Appellants,

v.

Facebook, Inc.,

Third Party Requester - Appellee

Appeal from the Patent Trial and Appeals Board in Appeal No. 2012-010411

_____

## OPENING BRIEF OF APPELLANTS
_____

Frank Michael Weyer (CA State Bar No. 127011)
TECHCOASTLAW
2032 Whitley Ave
Los Angeles CA 90068
fweyer@techcoastlaw.com
Phone (310) 494-6616, Fax (310) 494-9089
Attorney for Appellants

## CERTIFICATE OF INTEREST

Counsel for Appellants Frank M. Weyer and Troy K. Javaher certifies the following:

1.     The full name of every party or amicus represented by counsel are: Frank M. Weyer and Troy K. Javaher.

2.     The name of the real parties in interest represented by counsel are: Troy K. Javaher and Frank M. Weyer.

3.     The parent companies, subsidiaries (except wholly-owned subsidiaries) and affiliates that have issued shares to the public of the party or amicus curiae represented by counsel are:  None.

4.     The names of all law firms and partners or associates that appeared for the party or amicus now represented by me are:  TECHCOASTLAW, by and through Frank M. Weyer.


Dated: May 23, 2014             /s/ Frank Michael Weyer
                                Frank Michael Weyer
                                (CA State Bar No. 127011)
                                TECHCOASTLAW
                                2032 Whitley Ave
                                Los Angeles CA 90068
                                fweyer@techcoastlaw.com
                                Phone (310) 494-6616,  Fax (310) 494-9089
                                Attorney for Appellants Weyer and Javaher

# TABLE OF CONTENTS

**SECTION**                                                                          **PAGE**

CERTIFICATE OF INTEREST …………...………………...          ii

TABLE OF AUTHORITIES ………………………………...          iv

STATEMENT OF RELATED CASES ………………………...          vii

STATEMENT OF JURISDICTION …………………………....          1

I.      STATEMENT OF THE ISSUES ………………………..          2

II.     STATEMENT OF THE CASE …………………………..          3

III.    STATEMENT OF FACTS ………………………………          5

IV.     SUMMARY OF ARGUMENT ………………………….          23

V.      ARGUMENT …………………………………………….          25

VI.     CONCLUSION ………………………………………..          35

ADDENDUM I (Decision on Appeal dated 6/5/13) ……………          ADD 1

ADDENDUM II (Decision on Rehearing dated 12/27/2013) …..          ADD 84

ADDENDUM III (U.S. Patent No. 7,644,122) …………………          ADD 90

CERTIFICATE OF SERVICE   ………………………………...          ADD 109

CERTIFICATE OF COMPLIANCE………...………………...          ADD 110

# TABLE OF AUTHORITIES

**CASES**                                                          PAGE

In re Greenfield,

40 F.2d 775, 5 USPQ 474 (CCPA 1930)…………………………19

In re Kronig,

539 F.2d 1300 (CCPA 1976) …………………..………………21,30

Rambus v. Rea,

2013 WL 5312505 (C.A.Fed.)…………………..………………25,29,30

In re Baker Hughes Inc.,

215 F.3d 1297 (Fed. Cir. 2000)…………………....……………25

In re Stepan Co.,

660 F.3d 1341 (Fed. Cir. 2011)...………………..………………25,30

In re Yamamoto,

740 F.2d 1569 (Fed. Cir. 1984)…………...………..………………25

In re American Academy of Science Tech Center,

367 F.3d 1359 (Fed. Cir. 2004)…………………..………..…….25,26

In re Zletz,

893 F.2d 319 (Fed. Cir. 1989)…………………..………………26

Chef America, Inc. v. Lamb-Weston, Inc.,

358 F.3d 1371 (Fed. Cir. 2004)………………….………………26

In re Leithem,

661 F.3d 1316, 1319 (Fed.Cir.2011)..…………..……………30

In re Jung,

637 F.3d 1356 (Fed.Cir.2011)…………………..……………20


**RULES**

Fed. Cir. Rule 47.5 …………………………………………v

37 CFR §1.983 …………………………………………v

37 CFR §41.79(d) …………………………………………v

37 CFR 90.3 …………………………………………v

37 CFR 1.111(a) …………………………………………11

37 CFR 1.116(b) …………………………………………11

MPEP 2673.01 …………………………………………15

37 CFR 1.953(c) …………………………………………17

37 CFR §41.77(f) …………………………………………19

MPEP 2682 II.A …………………………………………19

37 CFR §41.77(b) …………………………………………30

## STATUTES

35 U.S.C. §141  …………………………………………………1

35 U.S.C. §101 …………………………………………5,7,9,23,26,27

35 U.S.C. §102 ………………………………………………9,10

35 U.S.C. §103 ………………………………………………9

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. Rule 47.5, the following pending related cases will directly affect or be directly affected by this Court's decision in the pending appeal:

Frank M. Weyer and Troy K. Javaher v. Myspace, Inc. and Facebook Inc., Civil Action No. CV 10-00499 MRP (FFMx), Central District of California

EveryMD v. Rick Santorum, Mitt Romney, and Newt Gingrich, Civil Action No. CV 12-01623 MRP (FFMx), Central District of California

There have been no prior appeals in this matter. There has been a prior appeal in the EveryMD v. Santorum et al. case cited above regarding the stay order entered by the Court below in that case (Case No. 2012-1491). That appeal was dismissed for lack of jurisdiction on October 12, 2012.

## <u>STATEMENT OF JURISDICTION</u>

This appeal is taken from the Decision on Appeal of the Patent Trial and Appeal Board ("PTAB" or "Board") dated June 5, 2013 and the PTAB's Decision on Rehearing dated December 27, 2013.  Jurisdiction is proper pursuant to 35 U.S.C.§141, 37 CFR §1.983 and 37 CFR §41.79(d).

This appeal is also timely.  The PTAB Decision on Rehearing that is being appealed was entered on December 27, 2013.  The Notice of Appeal was filed on January 7, 2014, within the required 63 day time period. 37 CFR 90.3.

# I.   STATEMENT OF THE ISSUES

Questions Presented:

    1.  Is the PTAB's interpretation of independent claims 1 and 26 as not requiring the claimed method steps to be performed by the claimed interface server computer reasonable?

    2.  If the PTAB's interpretation is reasonable, should the PTAB have designated its affirmance of the Examiner's rejections of all claims based on that claim interpretation as a new ground of rejection?

## II.   **STATEMENT OF THE CASE**

Appellants Frank M. Weyer and Troy K. Javaher ("the inventors") are the inventors and owners of U.S. Patent No. 7,644,122 entitled "Method, Apparatus, and Business System for Online Communications with Online and Offline Recipients" ("the '122 patent") which discloses inventions conceived and reduced to practice by the inventors during development of their website at www.everymd.com (which has been in continuous operation since the year 2001) and which were much later adopted by social networking companies, including third party requester Facebook, Inc. ("Facebook").

The '122 patent is subject of inter partes reexamination by the U.S. Patent and Trademark Office ("PTO") under Reexamination Control No. 95/001411. The '122 patent as originally issued contains independent claim 1 and dependent claims 2-15. During reexamination, the inventors added new dependent claims 16-25 and new independent claim 26. The Patent Examiner issued a RAN rejecting all pending claims 1-26 on August 19, 2011 based on some but not all of Facebook's proposed grounds of rejection. The inventors appealed the Examiner's rejections. Facebook appealed the Examiner's decision not to adopt certain of Facebook's proposed grounds of rejection. The Patent Trial and Appeals Board ("PTAB" or "Board") affirmed in part and reversed in part the Examiner's rejections on June 5, 2013. In affirming the

Examiner's rejections, the Board applied a broader claim interpretation than that used by the Examiner ("New Interpretation"). The Board also reversed the Examiner's decision not to adopt certain of Facebook's proposed grounds of rejection of claims 4, 5, 11, 15-19, 21 and 23-35. The Board designated its rejections of claims 4, 5, 11, 15-19, 21 and 23-35 under the grounds not adopted by the Examiner as new grounds of rejection, but did not designate its rejections under the New Interpretation as a new ground of rejection. Applicants timely requested rehearing on the issue of the Board's failure to designate the rejection of the claims based on the New Interpretation as a new ground. The request for rehearing was denied by the Board on December 27, 2013. The inventors timely filed a Notice of Appeal on January 7, 2014.

# III. STATEMENT OF FACTS

1.     Appellants Frank M. Weyer and Troy K. Javaher ("the inventors") are the inventors and owners of U.S. Patent No. 7,644,122 entitled "Method, Apparatus, and Business System for Online Communications with Online and Offline Recipients" ("the '122 patent") (ADD 91[1]).

2.     The application for the '122 patent (U.S. Patent Application Serial No. 11/623,132, "the 132 application") was filed on January 15, 2007, and claims priority to U.S. Patent Application Serial No. 09/447,755, filed on November 23, 1999. (ADD 91).

3.     On March 23, 2009, the Examiner issued an office action on the 132 application that included a rejection of then pending independent claim 1 and dependent claims 2-15 under 35 U.S.C. §101.  The Examiner stated:

> *Claims 1-15 are rejected under 35 U.S.C. 101 as not falling within one of the four statutory categories of invention.  While the claims recite a series of steps or acts to be performed, a statutory "process" under 35 U.S.C. 101 must (1) be tied to [a] particular machine . . . .* (A0082[2]).

4.     In response to the Examiner's 35 U.S.C. §101 rejection, the

---

[1] The designation "ADD" followed by a number (e.g. "ADD 22") refers to the page number in the Addendum hereto, which follows page 34 hereof.

[2] The designation "A" followed by a number (e.g. "A0006") refers to the page number in the Joint Appendix.

inventors amended the preamble and body of the claims to tie the claimed

process to two particular machines, namely an "interface server computer" and

a "database system."  The "interface server computer" was the particular

machine that carried out the method steps, while the "database system" was the

location where certain of the method steps were carried out by the "interface

server computer."  The inventors amended independent claim 1 as follows:

> 1.  (Currently amended)   A method for providing an online
> presence for a first member of a group of members *by an interface*
> *server computer* comprising the steps of:
>
>> maintaining a database comprising information associated
> with said first member *at a database system connected to said*
> *interface server computer;*
>
>> allotting a first URL to said first member *by associating said*
> *first URL with said first member in said database system;*
>
>> associating a first home page for said first member with said
> first URL *in said database system,* said first home page comprising
> information from said database associated with said first member;
> a first control for submitting a comment about said first member;
> and a second control separate from said first control for sending a
> message other than said comment to said first member;

> receiving *by said interface server computer* an online
>
> request for *said first URL from a requesting source;*
>
> > providing said home page *by said interface server computer*
>
> to said requesting source.

(A0090, emphasis in original, indicating the limitations added by amendment).

5.    In an office action dated Aug. 18, 2009, the Examiner acknowledged that the inventors' amendments overcame the Examiner's 35 U.S.C. §101 rejections.  The Examiner stated:

> *The claim amendments have overcome the 101 rejection raised in*
>
> *the previous office action.  Therefore, the 101 rejection is hereby*
>
> *withdrawn.*

(A0105).

6.    After a subsequent amendment to add additional limitations to overcome a subsequent prior art rejection, the '132 application was allowed and the '122 patent issued with independent claim 1 and dependent claims 2-15 on January 5, 2010.  Independent claim 1 as issued states:

> *1.    A method for providing individual online presences for a*
>
> *each of a plurality of members of a group of members by an*
>
> *interface server computer comprising the steps of:*
>
> > *maintaining a database comprising information associated*

with each of said plurality of members at a database system

connected to said interface server computer;

     allotting individual URLS to each of said plurality of

members by associating an individual URL with each individual

member of said plurality of members in said database system;

     associating an individual home page for each said

individual member of said plurality of members with said

individual URL allotted to said individual member in said

database system, said individual home page comprising

information from said database associated with said individual

member; a first control for submitting a comment about said

individual member; and a second control separate from said first

control for sending a message other than said comment to said

individual member;

     receiving by said interface server an online request for said

individual URL from a requesting source;

     providing said individual home page by said interface server

computer to said requesting source.

(ADD 108, emphasis added).

7.    Third party requester Facebook, Inc. ("Facebook") filed its original

request for inter partes reexamination on July 30, 2010 and its corrected request for inter partes reexamination on Aug. 25, 2010. (A0001). In the corrected request, Facebook identified thirteen (13) proposed grounds of rejection of claims 1-15 of the '122 patent under 35 U.S.C. §§102 and 103 based on twelve (12) prior art references, alone and/or in various combinations. (A0358).

8.    In the corrected request, Facebook acknowledged that independent claim 1 had been amended during prosecution to recite that the claimed method was performed by an interface server computer to overcome a 35 U.S.C. §101 rejection. Facebook stated:

> *The Examiner also rejected all of the claims under 35 U.S.C. §101*
>
> *as being directed to non-statutory subject matter. Office action*
>
> *(March 23, 2009). The applicants filed their response on April 20,*
>
> *2009, in which independent claim 1 was amended to recite that the*
>
> *method is performed by an interface server computer*

(A0365, emphasis added).

9.    In the corrected request, Facebook included claim charts for each proposed ground of rejection. Facebook asserted that the claim charts indicated how each of the patent claims were anticipated and/or obvious in view of the cited prior art references. For example, on page 58 of the corrected request, Facebook stated:

9

> *A claim chart setting forth a proposed ground of rejection of*
>
> *claims 1-15 as being anticipated by GeoCities under 35 U.S.C.*
>
> *§102(a) is set forth below.*

(A0410).

10.    The Examiner granted Facebook's request for reexamination and issued a first office action on October 6, 2010.  In the office action, the Examiner adopted all of Facebook's proposed grounds for rejections without comment or elaboration.  For example, with respect to the first proposed ground for rejection, the Examiner stated:

> *Claims 1-15 are rejected under 35 U.S.C. 102(a) as being*
>
> *anticipated by <u>Creating GeoCities Websites</u>, Ben Sawyer and Dave*
>
> *Greely, Muska & Lipman Publishing, April 10, 1999*
>
> *("GeoCities").*
>
>    *Requester has set forth proposed rejections on pages 58-89*
>
> *of the request.  The examiner <u>agrees with and adopts</u> the rejections*
>
> *of claims 1-15 which are incorporated in this Office Action.*

(A0347, emphasis in original).

11.    During inter partes reexamination, a patent owner has by law limited opportunities to amend claims.  The patent owner has an absolute right to amend only before the Examiner issues an Action Closing Prosecution

("ACP"), which is typically the second office action issued in inter partes reexamination. (37 C.F.R. 1.111(a); 37 C.F.R. 1.116(b)).

12. The inventors responded to the examiner's first office action on November 16, 2010. In the response, the inventors pointed out that the Examiner had adopted Facebook's proposed rejections without change. The inventors pointed out that Facebook's proposed rejections failed to create a prima facie case of obviousness or anticipation. The inventors stated:

> *Claim 1 claims "A method for providing individual online presences for each of a plurality of members of a group of members <u>by an interface server computer</u> comprising the steps of: . . . " For the prior art to disclose the method of claim 1, the prior art must at the very least disclose an <u>interface server computer</u> that <u>performs the recited method steps</u>. Requestor has not even attempted to do so. Instead, requestor has attempted to show only that there is disclosure of the <u>individual</u> claimed method steps, <u>performed at times by individual persons</u>, <u>somewhere</u> the various pieces of cited prior art. Requestor has not shown, or even attempted to show, that there is disclosure in the prior art of the claimed steps <u>being performed by an interface server computer</u>, as claimed. Accordingly, requestor has failed to establish a prima*

11

*facia case of anticipation or obviousness of independent claim 1.*
(A0337-A0338, emphasis in original).

13.     In their November 16, 2010 response, the inventors amended the
claims by adding new dependent claims 16-25 and new independent claim 26.
New independent claim 26 included the same preamble as independent claim 1.
(A0329-A0333).

14.     Facebook submitted its comments on the inventors' response on
December 16, 2010.  In its comments, Facebook did not disagree with the
inventors' statement that the limitations in the preamble of claim 1 require that
each of the claimed method steps must be performed by the claimed interface
server computer.  Facebook expressly acknowledged that the claimed method
steps must be performed by the interface server computer, but argued that the
cited prior art references do in fact disclose that an interface server computer
carries out all of the method steps.  Facebook stated:

> *[T]he Patent Owner identifies only two aspects of claim 1 that it*
> *contends are missing from the cited prior art: (1) an "interface*
> *server computer" that performs the recited claim steps; and (2)*
> *"providing individual online presences for each of a plurality of*
> *members of a group of members," which appears [sic] in the*
> *preamble of claim 1. As explained below, the prior art clearly and*

12

*unambiguously discloses both of these elements that Patent Owner*

*contends are missing.*

(A0285).

15. The next office action issued by the Examiner was the ACP issued on April 15, 2011. In the ACP, the Examiner expressly acknowledged that the claims require that all the claimed steps must be performed by an interface server computer. The Examiner stated:

> *The examiner notes that GeoCities is a web based application*
> *provided by a web server. As explained in GeoCities "A Web*
> *server is a computer system that stores Web pages that you can*
> *visit. Each site on the Internet has a Web server behind it." (page*
> *53, NOTE). The Web server(s) behind GeoCities web sites*
> *correspond to the claimed "interface server computer" set forth*
> *repeatedly in claims 1-15 of the '122 patent.* <u>*All of the steps in*</u>
> <u>*GeoCities disclosed methods are performed by this Web server(s),*</u>
> *thus, meeting all the "by said interface server computer"*
> *limitations recited in the claims.*

(A0228, emphasis added).

13

> *ICQ is a web based application with associated servers <u>which</u>*
>
> *<u>correspond to the claimed interface server computer in the same</u>*
>
> *<u>manner described above with respect to GeoCities</u>.*

(A0235, emphasis added).

> *de Hond is a web based application with a server (12)*
>
> *(corresponding to the claimed <u>interface server computer</u>) <u>that</u>*
>
> *<u>performs all of the method steps set forth below</u> in the fact findings*
>
> *for de Hond.*

(A0240, emphasis added).

> *Robertson is an intranet based application (page 152, column 1,*
>
> *1st paragraph and Fig. 2) which implies the use of an intranet*
>
> *server (corresponding to the claimed interface server computer)*
>
> *<u>that performs all of the method steps set forth below in the fact</u>*
>
> *<u>findings for Robertson</u>.*

(A0246, emphasis added).

> *ICQ 98a is a web based application with associated servers (page*
>
> *1, 4th paragraph). <u>These servers perform all of the steps discussed</u>*
>
> *<u>below</u>.*

(A0251, emphasis added).

16. In their response to the ACP filed on May 16, 2011, Applicants

showed in detail that, contrary to the assertions made by the Examiner, the prior art did not, either alone or in the combinations cited by the Examiner, disclose that all of the claimed method steps are carried out by the claimed interface server computer. (See, e.g. A0181-A0185).

17.     The next action issued by the Examiner was the Right to Appeal Notice ("RAN") issued on Aug. 19, 2011. (A0001).

18.     According to MPEP 2673.01, a RAN may not be issued if the Examiner makes any change in position adverse to the patent owner's position. MPEP 2673.01 states:

> The patent owner _must be given an opportunity_ to adequately
> 
> address any change in position adverse to the patent owner's
> 
> position. _A Right of Appeal Notice (RAN) cannot be issued_ until the
> 
> patent owner has had the opportunity to address each and every
> 
> rejection prior to the appeal stage. _Thus, the examiner should_
> 
> _reopen prosecution where any new ground of rejection is made_ or
> 
> any additional claim is rejected.

MPEP 2673.01 (emphasis added).

19.     The issuance of the RAN indicated that the Examiner did not change any of the Examiner's positions set forth in the ACP. MPEP 2673.01.

20.     In the RAN, the Examiner repeated the statements from the ACP

that the prior art discloses that all of the claimed method steps are carried out by the claimed interface server computer.  The Examiner again stated:

> *The examiner notes that GeoCities is a web based application provided by a web server. As explained in GeoCities "A Web server is a computer system that stores Web pages that you can visit. Each site on the Internet has a Web server behind it." (page 53, NOTE). The Web server(s) behind GeoCities web sites correspond to the claimed "interface server computer" set forth repeatedly in claims 1-15 of the '122 patent. <u>All of the steps in GeoCities disclosed methods are performed by this Web server(s)</u>, thus, meeting all the "by said interface server computer" limitations recited in the claims.*

 (A0120, emphasis added).

> *ICQ is a web based application with associated servers <u>which correspond to the claimed interface server computer in the same manner described above with respect to GeoCities</u>.*

(A0127, emphasis added).

> *de Hond is a web based application with a server (12) (corresponding to the claimed interface server computer) <u>that</u>*

16

> *performs all of the method steps set forth below* in the fact findings
>
> for de Hond.

(A0132, emphasis added).

> *Robertson is an intranet based application (page 152, column 1,*
>
> *1st paragraph and Fig. 2) which implies the use of an intranet*
>
> *server (corresponding to the claimed interface server computer)*
>
> *that performs all of the method steps set forth below in the fact*
>
> *findings for Robertson.*

(A0138, emphasis added).

> *ICQ 98a is a web based application with associated servers (page*
>
> *1, 4th paragraph). These servers perform all of the steps discussed*
>
> *below.*

(A0143, emphasis added).

18.    After issuance of a RAN, a patent owner may not make any

amendments.  (37 CFR 1.953(c)).

19.    The inventors filed a Notice of Appeal to the Board of Patent

Appeals and Interferences ("Board") on Aug. 22, 2011.  Briefing for the appeal

was completed on February 13, 2012.  (A0001).  Oral argument was heard on

Oct. 17, 2012. (ADD 3).

20.    The Board issued its Decision on Appeal on June 5, 2013 (A0002,

17

"Decision on Appeal").

21.    In the Decision on Appeal, the Board affirmed in part and reversed

in part the Examiner's rejections.  In affirming the Examiner's rejections, the

Board applied a broader claim interpretation (the "New Interpretation") than

that used by the Examiner.  Instead of construing the preamble to require that

each of the claimed method steps be carried out by the claimed interface server

computer, the Board found the opposite, namely that all of the claimed method

steps <u>need not</u> be carried out by the claimed interface server computer.  The

Board stated:

> *After consideration of the respective positions of the parties, and*
>
> *for the foregoing reasons, we construe the phrase "by an interface*
>
> *server computer" in the preamble of claims 1 and 26 as <u>not</u>*
>
> *<u>requiring</u> that all recited steps are performed by an interface*
>
> *server computer. In that regard, and with particular reference to*
>
> *those claims, we conclude that the recited "maintaining ,"*
>
> *"allotting...," and "associating..." steps <u>need not</u> be performed by*
>
> *an interface server computer.*

(ADD 15, emphasis added).

22.    The Board affirmed the Examiner's rejection of all pending claims

1-26 based on the New Interpretation.  The Board did not designate its

rejections under the New Interpretation as a new ground of rejection. (ADD 73-ADD 79).

23.     The Board also reversed the Examiner's decision not to adopt certain of Facebook's proposed grounds of rejection of claims 4, 5, 11, 15-19, 21 and 23-35. The Board designated its rejections of claims 4, 5, 11, 15-19, 21 and 23-35 under the grounds not adopted by the Examiner as new grounds of rejection. (ADD 79).

24.     When a decision on appeal in inter partes reexamination includes a new ground of rejection, a patent owner may either:

(1)     Reopen prosecution. The owner may file a response requesting reopening of prosecution before the examiner. Such a response must be either an amendment of the claims so rejected or new evidence relating to the claims so rejected, or both.

(2)     Request rehearing. The owner may request that the proceeding be reheard by the Board upon the same record.
37 CFR §41.77(f).

25.     Filing a Request for Rehearing under 37 CFR §41.77(f) waives the right of the patent owner to request reopening of prosecution to address the new ground of rejection. MPEP 2682 II.A., citing In re Greenfield, 40 F.2d 775 (CCPA 1930).

19

26.     The inventors timely requested rehearing on the issue of the Board's failure to designate its rejection of all claims 1-26 based on the New Interpretation as a new ground of rejection on June 19, 2013.  (A0003).

27.     The request for rehearing was denied by the Board on December 27, 2013.  In its Decision on Rehearing, the Board stated:

> At the outset, it is not evident that the Examiner's rejections were premised necessarily on an interpretation of the preamble of claim 1 as requiring that all steps of the claimed method must be performed by an interface server computer. It is clear from the record that the claim scope advocated by the Patent Owner in connection with the "by said interface server computer" recitation of the preamble was a source of dispute between the Patent Owner and the Requester throughout the proceeding, with the Requester commenting that claim 1 does not require that all recited steps must be performed by the computer. The Examiner, in adopting the rejections proposed by the Requester, expressed agreement with the comments articulated by the Requester[3]. [Fn3: See, e.g., Action Closing Prosecution (mailed April 15, 2011), p. 54, and Right of Appeal Notice (mailed August 19, 2011), p. 55.]
>
> In any event, "the ultimate criterion of whether a rejection is

*considered 'new' in a decision by the board is whether appellants have had fair opportunity to react to the thrust of the rejection." In re Kronig, 539 F.2d 1300, 1302 (CCPA 1976). Even assuming that the Examiner construed claim 1 of the '122 patent more narrowly than did the Board in the Decision, our affirmance of the Examiner's rejection based on a broader interpretation of the limiting effect of the claim preamble did not alter the thrust of rejection. Indeed, in so affirming the rejection, our construction was not based on any underlying facts that were additional to, or different from, those on which the Examiner relied. In that regard, even if our interpretation of claim 1 may be broader in some respect, our affirmance of the rejection did not draw from the teachings of the prior art any more content than that which was relied on by the Examiner.*

*Furthermore, contrary to the Patent Owner's assertions, the Patent Owner had ample opportunity during the course of this reexamination proceeding to revise the claims by way of amendment. As noted above, the dispute between the Patent Owner and the Requester in connection with the "by said interface server computer" recitation was evident throughout the course of the*

*proceeding. The Patent Owner's decision to stand on its*

*interpretation of claim l's preamble in connection with the*

*corresponding claim scope urged was not due to a lack of*

*opportunity to amend the claims.*

(ADD 87-ADD 88).

28.     The inventors timely filed and served their Notice of Appeal on

January 7, 2014.

# IV.  SUMMARY OF ARGUMENT

**A.    The Board's Claim Interpretation is Unreasonable Because it Fails to Take Account of All Words in the Claim and Effectively Removes Express Claim Limitations from the Claims.**

All words in a claim must be considered in interpreting the claim.  The Board's New Interpretation fails to do so.  By interpreting the claim to require "*that the recited 'maintaining…,' 'allotting...,' and 'associating..' steps <u>need not</u> be performed by an interface server computer,*" the Board impermissibly strikes out the express claim limitation "by an interface server computer" added by the inventors to the preamble to overcome the Examiners 35 U.S.C. §101 rejections from the claim.  Under the Board's reasoning, the meaning of the claim is the same with or without those words.  Such a construction is contrary the rules of claim interpretation and therefore unreasonable.

**B.    The Board's Failure to Designate its Rejections Based on a Broader Claim Interpretation than that used by the Examiner as a New Ground of Rejection is Clearly Erroneous and Contrary to Law**

The Board's finding in the Decision on Rehearing that the inventors had notice of the New Interpretation used by the Board in the Decision on Appeal and ample opportunity to amend the claims in response to rejections based on the New Interpretation is clearly erroneous and contrary to law.  The earliest the

Examiner could even implicitly have adopted the New Interpretation is <u>after</u>
Facebook proposed the New Interpretation, and that would have been in the
RAN. After a RAN, however, no amendments are permitted, so even if the
inventors had "notice" that the Examiner adopted the New Interpretation in the
RAN, the inventors had <u>no opportunity</u> to amend the claims in response.
Accordingly, <u>even if</u> the Examiner did implicitly adopt Facebook's proposed
New Interpretation in the RAN (which the inventors do not believe the
Examiner did), and <u>even if</u> such implicit adoption constituted effective notice to
the inventors (which the inventors do not believe it does), the inventors still did
not have <u>any opportunity to respond</u>, because after issuance of a RAN, <u>no</u>
<u>amendments are allowed</u>. Accordingly, the Board should have designated its
rejections based on its broader claim interpretation as a new ground of rejection
even under its assertion that the Examiner implicitly adopted Facebook's
proposed New Interpretation in the RAN.

24

# V.    ARGUMENT

## A.    STANDARD OF REVIEW

### 1.    Claim Interpretation

The Court reviews claim construction of the Board *de novo*.  <u>Rambus v.
Rea</u>, 2013 WL 5312505*2 (C.A.Fed.), citing <u>In re Baker Hughes Inc.</u>, 215 F.3d
1297, 1301 (Fed. Cir. 2000).

### 2.    New Ground of Rejection

The Court reviews the issue of whether the Board relied on a new ground
of rejection *de novo*.  <u>Rambus v. Rea</u>, 2013 WL 5312505*6 (C.A.Fed.), citing
<u>In re Stepan Co.</u>, 660 F.3d 1341, 1346 (Fed. Cir. 2011).

## B.    THE BOARD'S NEW INTERPRETATION IS NOT
   REASONABLE

During inter partes reexamination the PTO (the Board or the Examiner)
applies the "broadest reasonable interpretation" to claim construction.  <u>In re
Yamamoto</u>, 740 F.2d 1569 (Fed. Cir. 1984).  This is a broader interpretation
than applied by a District Court, and is justified "Because applicant has the
opportunity to amend the claims during prosecution." <u>Yamatoto</u>, at 1571.  The
broadest reasonable interpretation must be <u>reasonable</u>.  <u>In re American
Academy of Science Tech Center</u>, 367 F.3d 1359, 1369 (Fed. Cir. 2004).  For a

construction to be reasonable, "words of the claim must be given their plain meaning unless the plain meaning is inconsistent with the specification." In re Zletz, 893 F.2d 319, 321 (Fed. Cir. 1989). "Ordinary, simple English words whose meaning is clear and unquestionable, absent any indication that their use in a particular context changes their meaning, are construed to mean exactly what they say." Chef America, Inc. v. Lamb-Weston, Inc., 358 F.3d 1371, 1372 (Fed. Cir. 2004).

The term at issue is the claim limitation "by an interface server computer" added by the inventors during prosecution to the preamble of independent claim 1 to overcome the Examiner's 35 U.S.C. § 101 rejection. The relevant portion of claim 1 (the preamble and the first three method steps[3]) is set forth below:

> 1. *A method for providing individual online presences for a each of a plurality of members of a group of members <u>by an interface server computer</u> comprising the steps of:*
>
> *maintaining a database comprising information associated with each of said plurality of members at a database system connected to said interface server computer;*
>
> *allotting individual URLS to each of said plurality of*

---

[3] Out of five total steps in independent claim 1

> members by associating an individual URL with each individual
>
> member of said plurality of members in said database system;
>
> > associating an individual home page for each said
>
> individual member of said plurality of members with said
>
> individual URL allotted to said individual member in said
>
> database system,

(ADD 108, emphasis added). Even though the inventors expressly amended the preamble to require that the claimed method be carried out by an interface server computer to overcome the Examiner's 35 U.S.C. §101 rejection, the Board held, to the contrary, that the first three claimed steps need not be carried out by the interface server computer. The Board did not explain what piece of apparatus was required to carry out those three steps, stating only that:

> we construe the phrase "by an interface server computer" in the
>
> preamble of claims 1 and 26 as not requiring that all recited steps
>
> are performed by an interface server computer. In that regard,
>
> and with particular reference to those claims, we conclude that
>
> the recited "maintaining…," "allotting…," and "associating…"
>
> steps need not be performed by an interface server computer.

(ADD 15).

By its construction, the Board <u>deleted</u> the words "by an interface server computer" from the preamble, rewriting the portion of the claim at issue as:

> 1.       *A method for providing individual online presences for a*
> *each of a plurality of members of a group of members ~~by an~~*
> *~~interface server computer~~ comprising the steps of:*
>
> > *maintaining a database comprising information associated*
> > *with each of said plurality of members at a database system*
> > *connected to said interface server computer;*
> >
> > *allotting individual URLS to each of said plurality of*
> > *members by associating an individual URL with each individual*
> > *member of said plurality of members in said database system;*
> >
> > *associating an individual home page for each said*
> > *individual member of said plurality of members with said*
> > *individual URL allotted to said individual member in said*
> > *database system,*

The Board may not simply delete an express limitation from a claim, particularly where, as here, the limitation was added to overcome a rejection by the Examiner and relied upon by the Examiner in withdrawing the rejection and allowing the claim to issue.  This is not a case where the patent owner is arguing that limitations from the specification <u>be read into</u> the claim.  This is a

case where the Board is construing the claim so as to <u>remove express, material limitations</u> from the claim. Doing so is contrary to the rules of patent interpretation applicable to the Patent Office during prosecution, which are applicable to inter partes reexamination as well. Because the Board's New Interpretation effectively deletes express, material claim language, it is not reasonable. The inventors respectfully request that the matter be remanded to the Board to apply the correct, broadest <u>reasonable</u> claim interpretation (namely that all of the claimed method steps must be carried out by the claimed interface server computer), and to reconsider the Examiner's rejections on appeal using that broadest <u>reasonable</u> interpretation.

## C. THE BOARD'S USE OF A BROADER CLAIM CONSTRUCTION THAN THAT USED BY THE EXAMINER CONSTITUTES A NEW GROUND OF REJECTION

The legal principal at issue here is the same one this Court recently applied in <u>Rambus v. Rea</u>, 2013 WL 5312505 (C.A.Fed.). Namely, that due process requires that a patent owner must be given <u>clear notice</u> of any ground of rejection applied by the PTO during inter partes reexamination, together with <u>an opportunity</u> to respond to such ground of rejection. As the Court stated in <u>Rambus v. Rea</u>:

*Under the Administrative Procedure Act, the PTO must ensure that the parties before it are "fully and fairly treated at the administrative level." In re Leithem, 661 F.3d 1316, 1319 (Fed.Cir.2011). Namely, the PTO must "provide prior notice to the applicant of all 'matters of fact and law asserted' prior to an appeal hearing before the Board." Stepan, 660 F.3d at 1345 (quoting 5 U.S.C. § 554(b)(3)). . . This framework limits the Board's ability to rely on different grounds than the examiner. The Board may not "rel[y] on new facts and rationales not previously raised to the applicant by the examiner." Leithem, 661 F.3d at 1319. . . The ultimate criterion is whether the appellant has had before the PTO a "fair opportunity to react to the thrust of the rejection." Jung, 637 F.3d at 1365 (quoting In re Kronig, 539 F.2d 1300, 1302–03 (CCPA 1976)) (internal quotation marks omitted). If that condition is not met, the Board must designate its decision a new ground of rejection and provide the appellant with an opportunity to respond.  See Stepan, 660 F.3d at 1346; 37 C.F.R. § 41.77(b). Failure to do so violates the appellant's notice rights and warrants vacatur of the Board's decision. Stepan, 660 F.3d at 1346. . . .  The Board has a procedure for issuing a new ground of*

> *rejection in appeals of inter partes reexaminations. 37 C.F.R. § 41*
>
> *.77(b). This procedure ensures that appellants have an appropriate*
>
> *opportunity to respond and, if necessary, supplement the record*
>
> *before the examiner. We cannot let the Board shortcut this*
>
> *procedure and deprive appellants of their due process rights.*

Rambus v. Rea, 2013 WL 5312505*6 (C.A.Fed.).

Prior to the Board's Decision on Appeal, the inventors had neither clear notice of any rejection by the Examiner based on the New Interpretation, nor any opportunity to respond to such a rejection. The Board contends that the Examiner adopted the New Interpretation at the time the Examiner issued the ACP, and that the inventors had notice thereof, because the Examiner "expressed agreement with the comments articulated by the Requester" in the ACP. However, prior to the ACP, Facebook had not yet proposed the New Interpretation. Instead, in Facebook's comments immediately preceding the ACP, Facebook acknowledged that the claimed method steps must be performed by the interface server computer. Instead of asserting that the claimed method steps did not need to be carried out by the interface server computer, as implied by the Board, Facebook argued that the cited prior art references do in fact disclose that the interface server computer carries out all of the method steps. Facebook stated:

> [T]he Patent Owner identifies only two aspects of claim 1 that it
>
> contends are missing from the cited prior art: (1) <u>an "interface</u>
>
> <u>server computer" that performs the recited claim steps</u>; and (2)
>
> "providing individual online presences for each of a plurality of
>
> members of a group of members," which appears [sic] in the
>
> preamble of claim 1. <u>As explained below, the prior art clearly and</u>
>
> <u>unambiguously discloses both of these elements</u> that Patent Owner
>
> contends are missing.

(A0285, emphasis added). Accordingly, the Examiner could not have adopted

the New Interpretation in the ACP, because it had not yet been proposed by

Facebook.

The next Examiner action after submission of those comments was the

RAN, in which the Examiner expressly repeated the same rejections set forth in

the ACP. The Examiner did not indicate any change in position from the ACP.

In fact, the very issuance of the RAN indicates that the Examiner did not adopt,

implicitly or explicitly, any new ground of rejection in the RAN. That is

because the MPEP <u>prohibits</u> the issuance of a RAN that includes any new

ground of rejection. A RAN <u>may not be issued</u> that contains a new ground of

rejection because the patent owner is not allowed to make any amendments

after issuance of a RAN, and therefore would not have any opportunity to

respond if a RAN included such a new ground of rejection. Accordingly, even if it were the case, as the Board asserts, that the Examiner <u>implicitly</u> adopted the New Interpretation in the RAN, the inventors had <u>no opportunity</u> to amend the claims in response to such new ground of rejection, because no amendments are permitted after issuance of the RAN. Accordingly, the Board was required to designate its rejections based on the New Interpretation a new ground of rejection <u>even if</u> the Examiner implicitly adopted it in the RAN (which the inventors do not believe the Examiner did), because the inventors never had an opportunity to respond.

Further, the Board's statement that even if the New Interpretation is broader than the Examiner's, there is no need to designate its rejections based on the New Interpretation as a new grounds of rejection because the Board's rejections "did not draw from the teachings of the prior art <u>any more content</u> than that which was relied on by the Examiner" is contrary to law. Obviously, by interpreting the claims more broadly, <u>fewer</u> teachings were required in the prior art to fall within that broader interpretation, <u>not more</u>. The standard for whether a rejection is a new ground is not whether or not new teachings from the prior art are applied, but whether the rejections are based on a <u>different</u> <u>basis</u>. A rejection based on a broader claim interpretation than previously used

is clearly a new ground of rejection, because it is made on a different basis,

namely the new, broader claim interpretation.

# VI.   CONCLUSION

As shown above, the New Interpretation applied by the Board in rendering its Decision on Appeal is not reasonable.  Accordingly, the inventors respectfully request that the Court remand this matter to the Board with instructions to reconsider the Examiner's rejections using the broadest <u>reasonable</u> claim interpretation, namely that all of the method steps must be performed by the claimed interface server computer.  In the alternative, if the Court finds that the Board's New Interpretation is reasonable, the inventors respectfully request that the Board be directed to designate its rejections based on the New Interpretation as a new ground of rejection, so that the inventors are given an opportunity to respond to the New Interpretation (such as, for example, by amending the claims), an opportunity they have heretofore not yet had.


Dated: May 23, 2014          <u>/s/ Frank Michael Weyer</u>
                             Frank Michael Weyer
                             (CA State Bar No. 127011)
                             TECHCOASTLAW
                             2032 Whitley Ave
                             Los Angeles CA 90068
                             fweyer@techcoastlaw.com
                             Phone (310) 494-6616,  Fax (310) 494-9089
                             Attorney for Appellants Weyer and Javaher

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## 2014-1378

Frank M. Weyer and Troy K. Javaher,

Patent Owners - Appellants,

v.

Facebook, Inc.,

Third Party Requester - Appellee

Appeal from the Patent Trial and Appeals Board in Appeal No. 2012-010411

_____

## ADDENDUM TO
## OPENING BRIEF OF APPELLANTS
_____

Frank Michael Weyer (CA State Bar No. 127011)
TECHCOASTLAW
2032 Whitley Ave
Los Angeles CA 90068
fweyer@techcoastlaw.com
Phone (310) 494-6616,  Fax (310) 494-9089
Attorney for Appellants

# ADDENDUM I

Decision on Appeal

June 5, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

FACEBOOK, INC.
Requester

v.

FRANK M. WEYER and TROY K. JAVAHER
Patent Owners

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122[1]
Technology Center 3900

_____

Before BIBHU R. MOHANTY, KEVIN F. TURNER, and
JOSIAH C. COCKS, *Administrative Patent Judges*.

COCKS, *Administrative Patent Judge*.


DECISION ON APPEAL


_____

[1] The patent involved in this *inter partes* reexamination proceeding (the "'122 Patent") issued to Frank M. Weyer and Troy K. Javaher on January 5, 2010.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

## I.    STATEMENT OF THE CASE

### A.    SUMMARY

Patent Owners Frank M. Weyer and Troy K. Javaher (collectively the
"Patent Owner") appeal under 35 U.S.C. §§ 134(b) and 315(a) the
Examiner's decision[2] to reject claims 1-26.[3]  Third-Party Requester
Facebook, Inc. ("Requester") urges that the Examiner's decision must be
affirmed.[4]  The Requester also cross-appeals under 35 U.S.C. §§ 134(c) and
315(b) from the Examiner's refusal to reject claims 4, 10-12, 15-19, and 21-
26 on additional grounds.[5]  The Patent Owner contends that the Examiner's
refusal in that regard was correct.[6]  We have jurisdiction under 35 U.S.C.
§ 6(b)(2).

Oral argument was heard on October 17, 2012.  A transcript of the
argument was entered into the record on December 7, 2012.

---

[2]    *See* Right of Appeal Notice mailed August 19, 2011 ("RAN"), which
is incorporated by reference in the Examiner's Answer mailed January 13,
2012.  In discussing the Examiner's rejections and decisions favorable to
patentability, this opinion makes reference to the RAN.

[3]    *See* Patent Owner's Appeal Brief filed October 20, 2011 ("PO App.
Br.") and Rebuttal Brief filed February 2, 2013 ("PO Reb. Br.").

[4]    *See* Requester's Respondent Brief filed November 21, 2011 ("Req.
Resp. Br.").

[5]    *See* Requester's Cross-Appeal Brief filed November 7, 2011 ("Req.
App. Br.") and Rebuttal Brief filed February 13, 2012 ("Req. Reb. Br.").

[6]    *See* Patent Owner's Respondent Brief filed November 30, 2011 ("PO
Resp. Br.").

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

B.   RELATED PROCEEDINGS

We are informed that the '122 Patent is involved in litigation styled *Weyer et al. v. MySpace et al.*, Civil Action No. CV 10-00499 MRP (FFMx) in the United States District Court for the Central District of California, which has been stayed (administratively dismissed) pending the outcome of this reexamination.  (PO App. Br., 1.)

C.   THE INVENTION

The invention of the '122 Patent relates to the field of online communications ('122 Patent, 1:20-24) and encompasses methods "for allowing on-line communications with members of a group of recipients for whom the invention has been implemented."  (*Id*. at ll. 58-61.)

Claims 1 and 26 are independent claims.  Claim 1 is reproduced below:[7]

> 1.    A   method   for   providing   individual   online
> presences  for  each  of  a  plurality  of  members  of  a  group  of
> members by a server comprising the steps of:

---

[7]    There is disparity between the listing of the claims which appears in Claims Appendix of Patent Owner's Appeal Brief and the listing of the claims in the Claims Appendix of Requester's Cross-Appeal Brief. According to the Patent Owner, the last amendment to the claims was filed on November 16, 2010.  (PO App. Br., 2.)  The Requester "agrees with the PO's statement if the Status of Amendments."  (Req. Resp. Br., 1.)  The amendment includes a complete listing of claims 1-26.  Neither party's claims appendix provides a listing of claims which corresponds to the claims as they appear in that amendment.  We understand the listing of the claims in the above-noted amendment to be the correct listing of the claims that are before us in this appeal.  This opinion, therefore, makes reference to the November 16, 2010 Amendment ("2010 PO Amend.") when reproducing claim language.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

> maintaining a database comprising information associated with each of said plurality of members at a database system connected to said server;
>
> allotting individual URLS to each of said plurality of members by associating an individual URL with each individual member of said plurality of members in said database system;
>
> associating an individual home page for each said individual member of said plurality of members with said individual URL   allotted to said individual member in said database system, said individual home page comprising information from said database associated with said individual member; a first control for submitting a comment about said individual member; and a second control separate from said first control for sending a message other than said comment to said individual member;
>
> receiving by said server an online request for said individual URL from a requesting source;
>
> providing said individual home page by said server to said requesting source.

(2010 PO Amend., 2.)[8]


D.    THE PRIOR ART


1.    Patent Owner's Appeal

The following prior art is involved in Patent Owner's Appeal:

| | | |
|---|---|---|
| Shane | 5,793,972 | Aug. 11, 1998 |
| de Hond | 5,796,395 | Aug. 18, 1998 |

---

[8]    In this opinion, the claims appearing the Patent Owner's 2010 Amendment have been reproduced without status identifiers or underlining.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

| Chandra | 6,085,242 | July 4, 2000 |
| O'Neal | 6,711,154 | Mar. 23, 2004 |

Judith S. Donath, "Sociable Information Spaces," MIT Media Laboratory, June 20, 1995 ("**Donath**").

Robertson et al., "Web-Based Collaborative Library Research," US West, 1997 ("**Robertson**").

Ben Sawyer and Dave Greely, Creating GeoCities Websites, Muska & Lipman Publishing, 1998 ("**GeoCities**").

ICQ™ Ver. 98 a User's guide, Mirablis, Ltd., 1998 ("**ICQ98a**").

Peter Weverka and Michael Taylor, ICQ for Dummies, IDG Books Worldwide, Inc., 1999 ("**ICQ**").

2. <u>Requester's Cross-Appeal</u>

In addition to the prior art noted above in connection with the Patent Owner's Appeal, the Requester relies on the following prior art:

Standard for the format of ARPA Internet Text Messages, RFC # 822, August 13, 1982) ("**RFC 822**").

David J. Coleman et al., (Information Access and Network Usage in the Emerging Spatial Information Marketplace, Journal of the Urban and Regional Information Systems Associated, Vol. 9, No. 1, (Spring 1997)("**Coleman**").

Brad Hill, Yahoo! For Dummies, (August 1999) ("**Yahoo!**")

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

E.    THE INVOLVED REJECTIONS

1.    Patent Owner's Appeal

The Examiner adopted the following grounds of rejection under 35 U.S.C. § 102:

(1)    Claims 1-15 as anticipated by GeoCities;

(2)    Claims 1-4, 6-9, and 12-14 as anticipated by ICQ;

(3)    Claims 1-5, 7-9, 11, and 13-15 as anticipated by de Hond;

(4)    Claims 1-3, 7-9, and 11 as anticipated by Robertson;

(5)    Claims 1, 2, 8, 13, and 14 as anticipated by ICQ 98a;

(6)    Claims 18-25 as anticipated by GeoCities;

(7)    Claims 16, 20 and 22-25 as anticipated by ICQ;

(8)    Claims 20, 23, and 24 as anticipated by de Hond;

(9)    Claims 20, 22, and 26 as anticipated by Robertson;

The Examiner adopted the following grounds of rejection under 35 U.S.C. § 103(a):

(10)    Claims 1-15 as unpatentable over GeoCities and de Hond;

(11)    Claims 1-15 as unpatentable over ICQ and de Hond;

(12)    Claims 1-5, 7-9, 11, and 13-15 as unpatentable over de Hond and Chandra;

ADD 007

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

(13)    Claims 1-5, 7-9, 11, and 13-15 as unpatentable over
de Hond and Shane;

(14)    Claims 1-5, 7-9, 11 and 13-15 as unpatentable over
Donath and de Hond;

(15)    Claims 1-5, 7-9, 11, and 13-15 as unpatentable over
ICQ 98a and de Hond;

(16)    Claim 17 as unpatentable over ICQ and O'Neal.

The Examiner adopted the following ground of rejection under 35
U.S.C. § 112:

(17)    Claims 16 and 17 as failing to comply with the written
description requirement of 35 U.S.C. § 112, first
paragraph.

2.    Requester's Cross-Appeal

The Examiner declined to adopt the following grounds of rejection
under 35 U.S.C. § 102:

(18)    Claims 5, 10, 11, and 15 as anticipated by ICQ;

(19)    Claims 4 and 12 as anticipated by ICQ 98a;

(20)    Claims 4 and 12 as anticipated by Robertson;

(21)    Claim 19 as anticipated by ICQ 98a;

(22)    Claim 22 as anticipated by ICQ 98a;

(23)    Claims 23-25 as anticipated by ICQ 98a;

7

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

(24)   Claim 25 as anticipated by de Hond;

(25)   Claim 26 as anticipated by GeoCities;

(26)   Claim 26 as anticipated by ICQ 98a;

The Examiner declined to adopt the following grounds of rejection under 35 U.S.C. § 103(a):

(27)   Claim 16 as unpatentable over ICQ and O'Neal;

(28)   Claims 16 and 17 as unpatentable over GeoCities and O'Neal;

(29)   Claims 16 and 17 as unpatentable over Robertson and O'Neal;

(30)   Claim 18 as unpatentable over GeoCities and RFC 822;

(31)   Claim 18 as unpatentable over ICQ  and RFC 822;

(32)   Claim 18 as unpatentable over ICQ 98a and RFC 822;

(33)   Claim 18 as unpatentable over de Hond and RFC 822;

(34)   Claim 18 as unpatentable over Robertson and RFC 822;

(35)   Claim 19 as unpatentable over ICQ, RFC 822, and GeoCities;

(36)   Claim 19 as unpatentable over ICQ 98a, RFC 822, and GeoCities;

(37)   Claim 19 as unpatentable over de Hond, RFC 822, and GeoCities;

(38)   Claim 19 as unpatentable over Robertson, RFC 822, and GeoCities;

8

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

(39)   Claim 21 as unpatentable over GeoCities and Coleman;

(40)   Claim 21 as unpatentable over ICQ and Coleman;

(41)   Claim 21 as unpatenable over ICQ 98a and Coleman;

(42)   Claim 21 as unpatentable over de Hond and Coleman;

(43)   Claim 21 as unpatentable over Robertson and Coleman;

(44)   Claims 23-25 as unpatentable over GeoCities and Yahoo!;

(45)   Claims 23-25 as unpatentable over  ICQ, and Yahoo!;

(46)   Claims 23-25 as unpatentable over ICQ 98a and Yahoo!;

(47)   Claims 23-25 as unpatentable over de Hond and Yahoo!;

(48)   Claim 26 as unpatentable over GeoCities;

(49)   Claim 26 as unpatentable over ICQ 98a; and

(50)   Claim 26 as unpatentable over Robertson.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

II.   ANALYSIS

   A.   PATENT OWNER'S APPEAL

   By our count, the Examiner entered; (a) nine grounds of rejection based on anticipation under 35 U.S.C. § 102 (numbered (1)-(9) in this opinion); (b) seven grounds of rejection based on obviousness under 35 U.S.C. § 103(a) (numbered (10)-(16)); and (c) one ground under 35 U.S.C. § 112 (numbered (17)). The Patent Owner submits that the Examiner has not established an appropriate prima facie basis for any of those rejections. We observe also that the Patent Owner contends that it has provided sufficient evidence directed to "secondary indicia of non-obviousness" so as to outweigh the above-noted rejections premised on obviousness. (PO App. Br.7-8; PO Reb. Br. 5-6.)

   1.   Initial Matter

   At the outset, we observe that the Patent Owner, in its Rebuttal Brief, contends that the Examiner's Answer contains a procedural irregularity requiring that, pursuant to § 2677 of the Manual of Patent Examination Procedure, "the proceeding must be remanded to the Examiner." (PO Reb. Br. 3.) According to the Patent Owner, that irregularity follows from the statement appearing in the Examiner's Answer that the grounds of rejection set forth in the RAN are incorporated by reference and are maintained by the Examiner. (*Id*. at 1-2; *see also* Ans., 1.) In that regard, the Patent Owner is of the view that the Answer does not address adequately the patentability arguments it has submitted in support of the claims, and in doing so "the Examiner fails to raise even a prima facia [sic] case of" the unpatentability of the involved claims. (*Id*. at 2.)

10
ADD 011

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

The Patent Owner's contention is misplaced. We understand the
Examiner's Answer and its incorporation by reference of the RAN as
constituting the Examiner's response to the arguments raised by the Patent
Owner in its Appeal Brief. The remedy to any such insufficiency of
argument by the Examiner would be reversal based on the unpersuasiveness
of the argument. Given that the appeal at hand has been fully briefed by the
parties and the Office has set forth its position as reflected in the Examiner's
Answer, it is the Board's obligation, pursuant to 35 U.S.C.
§§ 6(b)(2), 134(b) and 315(a), to now decide the appeal.

Accordingly, we turn to the evaluation of the claim rejections which
have given rise to the Patent Owner's Appeal.

2.     Claim Construction

In assessing the merits of the rejections that are before us, we find it
necessary to interpret the claims. In particular, we must ascertain whether
the methods of claims 1 and 26 require that each and every step contained
therein must be performed by an interface server computer. The Patent
Owner submits that an interface server computer is so required to perform
each and every step (PO App. Br., 5-6), whereas the Requester takes an
opposing position. (Req. Resp. Br., 2-3).

Each of claims 1 and 26 includes multiple similar steps which make
up their respective recited methods. Of those claims steps, several expressly
recite that the particular step is performed "by said interface server." (2010
PO Amend., 2 and 6.) There is no dispute that those steps must be
performed by a server. Instead, the dispute centers on the other steps of the
claims which do not individually associate a server with performing the

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

particular step.  The Patent Owner's position that the steps are performed by
a server is based on language appearing in each preamble of claims 1 and 26.
In particular, the preamble of each of claims 1 and 26 is reproduced below:

> A method for providing individual online presences for a
> [sic] each of a plurality of members of a group of members by
> an interface server computer comprising the steps of:

(*Id.*)  The Patent Owner contends that given the above-noted recitation that
the method is generally performed "by an interface server computer," every
associated step that makes up the method must necessarily be performed by
that server.  (PO App. Br., 5-6.)  In challenging that contention, the
Requester urges that the "by an interface server computer" recitation in the
preamble does not limit the claims in the manner proposed by the Patent
Owner. (Req. Resp. Br., 2-3.)

After careful consideration of the record before us, we are persuaded
that the Requester's position is correct.  As noted by the Requester, each of
claims 1 and 26 includes explicit recitation that certain steps within the body
of the claim are performed either "by an interface server" or "by said
interface server computer," whereas other steps include no such recitation.
(*See* 2010 PO Amend., 2, 5-6.)  That some steps individually recite that their
performance is accomplished by the server computer, and others do not,
suggests that all the steps need not be performed by the server computer.

The Patent Owner, citing to the Manual of Patent Examining
Procedure § 2110.02, contends that the preambles of the claims are
"necessary to give life, meaning, and vitality" to the claims, and should
therefore be construed as part of the balance of the claims.  (PO App. Br., 5.)
However, even assuming that is true, the contention is misplaced.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

During reexamination, claims are given their broadest reasonable construction consistent with the specification. *In re Suitco Surface, Inc.,* 603 F.3d 1255, 1259 (Fed. Cir. 2010). That the preamble of each of claims 1 and 26 specifies that the method is generally performed "by an interface server computer" does not mean that all steps need be so performed. In that regard, the method reasonably is understood as being performed by the server computer if at least some of the steps are executed by that component. If the Patent Owner intended that each step be carried out by the interface server computer, it was the Patent Owner's opportunity and responsibility to remove ambiguity in that regard by way of amendment to the claims. *See In re Bigio,* 381 F.3d 1320, 1324 (Fed. Cir. 2004).

Indeed, the '122 Patent itself conveys the following with respect to contemplated components which may perform particular described functions:

> [A]lthough certain functions have been described herein as being provided by an interface server computer, those functions may be provided by one or more other devices.

('122 Patent, 13:57-58.) Thus, the '122 Patent contemplates that devices other than an interface server computer may perform functions of the invention described therein.

We are cognizant of the Patent Owner's contention that the above-noted portion of the '122 Patent recitation describes alternative embodiments that have been "expressly disavowed" through the recitation of "by an interface server computer" in the preambles of claims 1 and 26. (PO Reb. Br., 3-4.) However, the contention does not account for the broadest reasonable interpretation of the phrase "by an interface server computer"

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

appearing in the preamble. As discussed, above the methods of claims 1 and 26 are understood reasonably as being performed "by an interface server computer" if at least some of the steps are performed by that component.

After consideration of the respective positions of the parties, and for the foregoing reasons, we construe the phrase "by an interface server computer" in the preamble of claims 1 and 26 as not requiring that all recited steps are performed by an interface server computer. In that regard, and with particular reference to those claims, we conclude that the recited "maintaining…," "allotting…," and "associating…" steps need not be performed by an interface server computer.

With respect to the remaining terms of the claims, we observe that during reexamination there is a "heavy presumption" that a claim term is given its ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Indeed, the ordinary and customary meaning as would be understood by one with ordinary skill in the art usually applies unless an inventor has acted as his or her own lexicographer and has set forth a special meaning for a claim term. *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). Furthermore, in some cases, the ordinary meaning of claim language to one of ordinary skill in the art is readily apparent even to lay judges such that claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).

Here, the inventors of the '122 Patent have not acted as their own lexicographers. There is also no dispute as between the parties or the

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

Examiner as to the meaning of any claim terms beyond the "by an interface server" of the preambles of claims 1 and 26. Accordingly, we construe all terms of the claims involved in this appeal as having their ordinary and customary meaning as would be understood by one with ordinary skill in the art.

### 3. The 35 U.S.C. § 112 Rejection

The Examiner rejected claims 16 and 17 as failing to comply with the written description requirement of § 112, first paragraph. (RAN, 44.) Claim 16 depends ultimately from claim 1. Claim 17 depends from claim 16. Claim 16 adds the step of "sending by said server a message to a telephone of said individual member in response to receiving said message entered into said message entry interface." (Req. App. Br., 32.)

In rejecting claims 16 and 17, the Examiner "incorporate[s]" into the RAN "pages 8 and 9 of third party's comments." (RAN, 44.) We understand the "comments" as being those submitted by Requester on December 16, 2010.[9] According to the comments, claim 16 encompasses more in scope than is described in the specification of the '122 Patent. In particular, citing to column 8, lines 63-67 of the '122 Patent, Requester contends that "[t]he written description makes clear that the alleged invention is capable of sending an email message to a telephone *__only__* when no fax number for the member is present in the database." (2010 Req. Com., 8) (emphasis in original.) Column 8, lines 63-67 reads:

---

[9]     *See* "Requester's Comments on Patent Owner's Response in Inter Partes Reexamination of U.S. Patent No. 7,644,122" filed December 16, 2010 ("2010 Req. Com.").

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

> If no fax number for the recipient is found in the contact
> information obtained from the contact data base at step 545, the
> e-mail message is converted to a voice message at step 550 and
> delivered as a voice message to the recipient's telephone
> number at step 554.

The above-quoted portion describes an embodiment of the invention
of the '122 Patent in which, given a particular circumstance, *i.e.*, no fax
number for a recipient is found, an e-mail message is converted to a voice
message and delivered to a recipient's telephone number. The '122 Patent
also describes the conversion process with respect to the above-noted
embodiments as well as "more embodiments." ('122 Patent, 8:67-9:2.) That
process is laid out at columns 9 and 10 and is illustrated in Figure 7.

To satisfy the written description requirement of 35 U.S.C. § 112, an
applicant must convey with reasonable clarity to those skilled in the art that
he or she was in possession of the claimed invention. *Vas-Cath Inc. v.
Mahurkar,* 935 F.2d 1555, 1563-64 (Fed. Cir. 1991). One shows
"possession" of the invention by describing the invention using such
descriptive means as words, structures, and figures. *Lockwood v. American
Airlines, Inc.,* 107 F.3d 1565, 1572 (Fed. Cir. 1997). Furthermore, a single
disclosed embodiment may provide written description support for a generic
claim that encompasses more embodiments. *Bilstad v. Wakalopulous,* 386
F.3d 1116, 1124 (Fed Cir. 2004).

Here, as noted above, the '122 Patent discloses one embodiment in
which a particular factual scenario gives rise to the conversion of an e-mail
to voice message conversion and delivery of that message to a telephone,
*i.e.*, the absence of a fax number. However, while that particular

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

embodiment accounts for the absence of a fax number, it is not apparent that
the process as described at columns 9 and 10 and Figure 7 would be
different in the circumstance in which a fax number is present. That is,
those columns and that Figure do not set forth that either the absence or the
presence of a fax number has any impact on the operation of converting an
e-mail to a voice mail message and the subsequent delivery of the message
to a recipient's telephone number. Moreover, the '122 Patent also conveys
that other embodiments may also employ that operation. We do not discern
that those additional contemplated embodiments would have been
understood as requiring the absence of a fax number to the exclusion of all
other scenarios.

Upon review of the record before us, we are not persuaded that the
'122 Patent lacks adequate written description of the content of claims 16
and 17 so as to convey that the inventors did not have possession of that
content. We, therefore, reject Requester's argument to the contrary.

We do not sustain Examiner's decision to reject claims 16 and 17
under 35 U.S.C. 112, first paragraph.

4. The Anticipation Rejections

The nine anticipation rejections (numbered (1)-(9) in this opinion)
involved in the Patent Owner's Appeal are applied to claims 1-25[10] and
incorporate each of GeoCities, ICQ, de Hond, Robertson and ICQ 98a.

---

[10]     No anticipation rejection was adopted for claim 26.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

### a. GeoCities

The Examiner adopted rejections of claims 1-15 and 18-25 as anticipated by GeoCities (rejections numbered (1) and (6) in this opinion). GeoCities is a "guide" directed to the creation of Web sites. In that regard, the guide presents a series of Chapters describing various tools available for Web site development. (*See* Geocities "Contents" section.)

The Patent Owner challenges the Examiner's finding of anticipation. According to the Patent Owner, GeoCities does not disclose that a server performs all the steps set forth in the claims (*id.* at 8), and also that it lacks certain features of each of claims 1, 2, 3, 8, 9, 12, 18, 19, 21, and 23[11] (*id.* at 9-12; 28-30).

### i. Claim 1

At the outset, we observe that claim 1 does not require that all features of the claim need be performed by a server. Thus, the Patent Owner's blanket assertion (PO App. Br., 8) that GeoCities is deficient as an anticipatory disclosure because it allegedly does not disclose servers performing every step of the claims is misplaced. As discussed above, claim 1 does not require that certain steps, such as the "allotting" and "associating" steps appearing therein, must be performed by any particular component, such as a server. Therefore, the Patent Owner's argument alleging that GeoCities does not set forth a server so performing those steps is unavailing. (*See* PO Reb. Br., 6)

---

[11] No separate patentability arguments are advanced for claims 4-7, 10, 11, 13-17, 20, 22, 24, and 25.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

The Patent Owner also contends that GeoCities lacks disclosure of the "first control" and "second control" of claim 1. (PO App. Br., 8-9.) The Examiner pointed to a component termed "My Guestbook" as forming a first control and a component termed "E-Mail Me" as forming the second control. (RAN, 6.) As is disclosed in GeoCities, those two components are tools or buttons appearing on a member's web page and provide certain functionality when selected. (GeoCities, 193.) Specifically, "My Guestbook" is a feature that "allows visitors to leave you messages as well as comments and feedback about your site," and "E-Mail Me" is button that "allows visitors to e-mail you directly at the e-mail address of your choice." (*Id.*)

There is no dispute that the "My Guestbook" control provides the functionality of "for submitting a comment about said individual member" as laid out in claim 1. Neither is there any dispute that the "E-mail Me" control allows "for sending a message other than said comment to said individual member." Rather, the underlying basis of the Patent Owner's argument is that those controls are something that may be "chosen," or are "optional," and which are not included on a member's home page by "default." (PO App. Br., 8-9.) Evidently, according to the Patent Owner, if the controls are optional, or not provided by default, then GeoCities cannot anticipate claim 1. The argument, however, is misguided. Even if GeoCities does express that a feature may optionally be included, that does not mean that the reference somehow lacks disclosure of the feature. Indeed, that the control is expressed as an available option to be, or not be, selected is disclosure of both the presence and the absence of the feature. It

19

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

is not somehow a lack of disclosure of the feature as urged by the Patent Owner.

Anticipation is established when a single prior art reference discloses all elements of the claimed invention. *In re Spada*, 911 F.2d 705, 708 (Fed. Cir. 1990). After a careful evaluation of the record before us, including the content of GeoCities' disclosure and the arguments submitted by the Patent Owner, we are unpersuaded that GeoCities lacks disclose of all the features of claim 1. Accordingly, we <u>sustain</u> the rejection of claim 1 as anticipated by GeoCities.

### ii. Claims 4-7, 10, 11, 15, 17, 20, and 22

Claims 4-7, 10, 11, 15, 17, 20, and 22 ultimately depend on, and are argued collectively with, claim 1. The Patent Owner has not shown error in the Examiner's rejection of those dependent claims. We also <u>sustain</u> the rejection of claims 4-7, 10, 11, 15, 17, 20, and 22 as anticipated by GeoCities.

### iii. Claim 2

Claim 2 depends from claim 1 and adds the limitation "further comprising the step of providing by said interface server computer a message entry interface in response to activation of said second control." (2010 PO Amend., 2.) In rejecting claim 2, the Examiner finds that GeoCities discloses, at pages 271-274, that selection of the "E-mail me" feature, *i.e.*, the second control, activates Netscape and Outlet Express programs that operate to provide a message entry interface. (RAN, 7.) The Examiner also concludes that GeoCities discloses a "Web server" as an interface server computer that so provides the message entry interface. (*Id.*;

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

*see also* 5.)  The Requester echoes the position of the Examiner.  (Req.
Resp. Br., 5-7.)  The Patent Owner has a different view.  In particular, the
Patent Owner urges that the Netscape or Outlook Express programs run on
the member's own computer and the message entry interfaces they provide
are thus not "by a server."  (PO App. Br., 10.)

There is no disagreement among the Patent Owner, the Examiner, and
the Requester that it is programs disclosed in GeoCities that allow for the
creation of a message entry interface in response to activation of a control.
There is also no disagreement that, as a part of GeoCities' disclosure, there
exists a user or member's computer and a server computer component
accessible via the Internet or "Web."  As noted above, the question is what
GeoCities discloses with regard to which one of those computer devices
provides the message entry interface arising from selection of the "E-mail
me" feature.

In reviewing GeoCities' disclosure, we are of the opinion that it does
not provide a definitive answer to the above-noted question.  We are
cognizant of the Requester's position that other portions of GeoCities
describe that a "special program" residing on a Web server processes certain
HTML forms that also serve as message entry interfaces.  (Req. Resp. Br., 6,
citing GeoCities at pp. 235-240.)  However, lacking from those additional
portions of GeoCities is suitable disclosure that selecting the "E-mail Me"
control also enlists the functionality of a program on the GeoCities web
server.  It is, however, the specific "Email Me" control that the Examiner
has relied upon as the second control required by claim 2 in urging
anticipation.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

"[T]he hallmark of anticipation is prior invention," which means that
to anticipate, a reference must not only disclose "all elements of the claim
within the four corners of the document, but must also disclose those
elements 'arranged as in the claim.'" *Net MoneyIN, Inc. v. VeriSign Inc.*,
545 F.3d 1359, 1369 (Fed. Cir. 2008). Here, even if a skilled artisan may
apply GeoCities' teachings with respect to providing HTML forms via a
Web server to other functional aspects of its communication system, that is,
in our view, insufficient to establish that GeoCities itself conveys the same
functionality with respect to its "E-mail Me" feature. *See Net MoneyIN, Inc.*
545 F.3d 1359 at 1371 (For anticipation, "it is not enough that the prior art
reference discloses part of the claimed invention, which an ordinary artisan
might supplement to make the whole, or that it includes multiple, distinct
teachings that the artisan might somehow combine to achieve the claimed
invention.")

For the foregoing reasons, we are of the opinion that the Examiner has
not established adequately that GeoCities discloses all the limitations of
dependent claim 2 so arranged in the manner required by the claim.
Accordingly, we <u>do not sustain</u> the Examiner's rejection of claim 2 as
anticipated by GeoCities.

*iv. Claims 8, 12-14, 18, and 19*

Claims 8 and 12-14 depend from claim 2. Claims 18 and 19 depend
from claim 8. Claims 8, 12-14, 18, and 19 thus require all the limitations of
claim 2. Because we are not persuaded that GeoCities discloses every
limitation required by claim 2, we also <u>do not sustain</u> the rejection of claims
8 and 12-14 as anticipated by GeoCities.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

### v. Claims 3 and 9

Claim 3 depends from claim 1 and adds the feature "further comprising the step of providing by said interface server computer a comment entry interface in response to activation of said first control." (2010 PO Amend., 2.) Claim 9 depends from claim 3 and is argued based on the content of claim 3. In rejecting claim 3, the Examiner relied on GeoCities' "Guestbook" feature. (RAN, 8.) As discussed above, that feature is disclosed as a selectable link that allows for a visitor to a member's Web site to provide messages and comments about the site. (*See* GeoCities, 193.)

The dispute with respect to claim 3 is similar in nature to the dispute arising in connection with claim 2. Namely, the Patent Owner contends that the comment entry interface generated by selecting GeoCities' "Guestbook" is not one provided by the interface server computer. (PO App. Br., 10.) The Examiner and the Requester do not agree with that contention.

Although the Examiner generally contends that GeoCities' Web servers perform the function attributed to the "Guestbook" feature, the Examiner does not point to content of GeoCities in support of that contention. The portions of GeoCities on which the Examiner relies makes clear that the "Guestbook" control allows for comment entry (*see* GeoCities, 193 and 196-197.) However, simply put, those portions do not provide elucidation as to which component actually provide the particular functionality. As we observed above with respect to claim 2, although a skilled artisan may appreciate from the content of GeoCities as a whole that

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

a Web server is an option for so providing the pertinent functionality, that is insufficient to establish that GeoCities itself anticipates claim 3.

Accordingly, we <u>do not sustain</u> the rejection of claims 3 and 9 as anticipated by GeoCities.

*vi. Claim 21*

Claim 21 depends from claim 1 and adds the limitation: "wherein said individual home page further comprises a third control separate from said first and second controls for providing a map indicating a location of said member." (2010 PO Amend, 5.)

The Examiner points to GeoCities' disclosure at page 95 and 139 of a "Link" as forming the required third control. (RAN, 45.) In challenging the Examiner's rejection, the Patent Owner makes the following argument:

> The "Link" disclosed by GeoCities is not found on any home page associated by the GeoCities servers with the URL of a member, but is a link that <u>a member</u> can <u>manually add</u> to a web page <u>created by the member</u>.

(PO App. Br., 29) (emphasis in original). The basis of the Patent Owner's arguments stems from the following disclosures in Geocities:

> **Link**
> Choosing Link asks you to select a Web address, a file in your directory, or an e-mail address that you would like to link to. First, you must select an object that you want to be the link (what visitors will click upon) and then click on the Link button.

(GeoCities, 95.) The above-quoted portion of GeoCities appears in a section describing a "GeoBuilder" tool that is used by a member in creating and designing their home page. (*See id.* at 89.) The "Link" feature is an option

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

to a member for adding a particular selectable object or link on the home page. As such an object, the "Link" is understood readily as a control appearing on the home page and presented for selection by a visitor to the page.

The Patent Owner's argument is misplaced that the "Link" is not the required third control because a member in designing their page must initially take action to enable the functionality. Once the "Link" is established it thereafter appears on the home page. Claim 21 does not somehow preclude the act of adding such a Link to the home page, as is suggested by the Patent Owner.

We are not persuaded of error in the Examiner's rejection of claim 21 as anticipated by GeoCities. We <u>sustain</u> the rejection.

*vii. Claims 23-25*

Claim 25 depends from claim 24 and claim 24 depends from claim 23. Claim 23 depends from claim 1 and adds the feature: "providing by said interface server computer a user interface comprising a member search data entry area for receiving search data for a member of said group of members." (2010 PO Amend., 5.)

The Examiner relies in-part on GeoCities' disclosure at page 208. That page describes a "GeoCities Search Box" feature that may be added to a Web page. The page also describes the procedures that a member goes through to implement the functionality of the "GeoCities Search Box" onto their page. Those procedures include initial action by a member, such as applying HTML code to the Web page.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

As with claim 21, the Patent Owner postulates that claim 23 is not anticipated by GeoCities because of the initial actions necessary by a user in importing the "Search Box" functionality onto a Web page. (See PO App. Br., 30.) The Patent Owner's argument, however, is unpersuasive. Claim 23 does not preclude action by a member in designing their Web page to incorporate the "Search Box" feature on the page. We reject Patent Owner's argument in that regard.

Accordingly, we <u>sustain</u> the rejection of claims 23-25 as anticipated by GeoCities.

## b. ICQ

The Examiner rejected claims 1-4, 6-9, 12-14, 16, 20 and 22-25 as anticipated by ICQ (rejections numbered (2) and (7) in this opinion). ICQ is characterized as a "guide" conveying information with respect to the computer program "ICQ." (ICQ Introduction.) "ICQ" is understood as an acronym or abbreviation for "I seek you." (*id.* at Chapter 1, p. 7.) By way of introduction, the ICQ reference generally summarizes its content as follows:

> Everybody uses ICQ to chat and exchange messages. We'll show you how to do the conventional stuff. And we'll also tell you about the 101 other ICQ features. For example, we'll show you how to find people in the ICQ community who share your interests, exchange files and other items with ICQ members, and search the Internet from ICQ. We'll show you how to maintain your privacy and still reach into every corner of ICQ.

(*Id.* at Introduction.) The Patent Owner argues dependent claims 4, 6, 7, 9 and 20 collectively with independent claim 1. The Patent Owner submits separate arguments for each of claims 2, 3, 12, 16, 22, and 23. Claims 8, 13, and 14 ultimately depend from claim 2, claim 9 depends from claim 3, and

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

claims 24 and 25 ultimately depend from claim 23. We consider the claims
in the following groupings: (1) claims 1, 4, 6, 7, and 20; (2) claims 2, 8, 13,
and 14; (3) claims 3 and 9; (4) claim 12; (5) claim 16; (6) claim 22; and (7)
claims 23-25.

*i. Claims 1, 4, 6, 7, and 20*

In rejecting claim 1 based on ICQ, the Examiner assesses in detail
where ICQ discloses the features required by the above-noted claims. (*E.g.*,
RAN 12-17.) In challenging the Examiner's assessment of ICQ, the Patent
Owner argues that certain features of claim 1 are absent from ICQ.

In particular, Patent Owner contends that ICQ does not disclose that
specific steps required by claim 1 are performed "in said database system."
(PO App. Br., 13.) In the rejections proposed by the Requester and adopted
by the Examiner, ICQ's disclosure of a "Message Archive" is equated with
the database set forth in claim 1. (*See* RAN, 12.) Pointing to content of ICQ
at page 260, the Examiner submits that the Message Archive performs steps
of claim 1. (*Id.*) The Patent Owner argues that there is a distinction between
ICQ's Message Archive and the required database in that the Message
Archive is urged as software "maintained <u>on the user's computer</u>" and "<u>not
on the ICQ servers</u>." (PO App. Br., 13) (emphasis in original). According
to the Patent Owner, that is a difference which distinguishes ICQ's
disclosure over the requirements of claim 1. On this record, we do not
agree.

As is evident from the Patent Owner's Rebuttal Brief, the Patent
Owner is of the view that claim 1 requires that the database be "<u>maintained
by</u> the claimed server" and that ICQ's Message Archive is not so

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

maintained. (*See* PO Reb. Br., 8) (emphasis in original). Yet, as discussed
*supra*, we conclude that the "maintaining the database. . ." step of claim 1 is
not tethered to operation of an interface server computer or other particular
computer. In reviewing the record, ICQ's "Message Archive," as described
for instance beginning on page 260, is understood reasonably as performing
the steps of claim 1 directed to the database system. That is the position
which is advocated by the Examiner and the Requester. (*See* RAN, 12; Req.
Resp. Br., 8.) That the Message Archive may be maintained, in part or in
whole, on a user's computer rather than in some other location, such as an
interface server computer, is of no moment. In other words, even assuming
that ICQ's Message Archive is maintained on the user's computer, that itself
does not render ICQ's disclosure as beyond the scope of claim 1. We are
thus unpersuaded by the Patent Owner's argument.

The Patent Owner also takes the position that claim 1's requirement of
a "control" that allows for the submission of a comment about an individual
member (expressed in claim 1 as a "first control") is lacking from ICQ. (PO
App. Br., 13-14.) In accounting for that control, the Examiner relies on
ICQ's disclosure of a "Guestbook" option for the submission of comments.
(RAN 13, citing ICQ pp. 203-204.)

ICQ's "Guestbook" is disclosed as a screen that constitutes "a place
where visitors to a site can enter their names, other information, and perhaps
a comment or two about the site." (ICQ, 203-204.) As shown, for instance,
at Figure 11-6 on page 200 of ICQ, the "Guestbook" may be accessed from
the "My Personal Communication Center" of a member's "My Personal ICQ
Homepage." We thus share the view of the Examiner and the Requester

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

(Req. Resp. Br., 8-9) that ICQ's "Guestbook" constitutes a control associated with and accessed from an individual home page and allows for comment submission.

      According to the Patent Owner, ICQ's "Guestbook" is not the required control because it is not "on the individual home page" and is instead a feature that is instead something added "to a different web-like page." (PO App. Br., 14, emphasis removed; *see also* PO Reb. Br., 8-9.) The Patent's argument is misplaced. The claims do not require that the control be "on" the home page. Indeed, the claims do not require any particular association of the first control with the home page. Moreover, even were we to assume that claims do require that the control be located "on" the homepage, that is what is disclosed in ICQ. As noted above, the reference sets forth, for instance at page 200, that the Guestbook feature is an available tool that is located on, and accessed from, the member's homepage. We reject the Patent Owner's argument to the contrary.

      We have considered the Patent Owner's arguments, but for the foregoing reasons we are not persuaded that they show error in the Examiner's rejection of claims 1, 4, 6, 7, and 20. In light of the record before us, we <u>sustain</u> the rejection of claims as anticipated by ICQ.

*ii. Claims 2, 8, 13, and 14*

      Claims 8, 13, and 14 ultimately depend from claim 2. As discussed above, claim 2 adds to claim 1 the feature: "further comprising the step of providing by said interface server computer a message entry interface in response to activation of said second control." (2010 PO Amend., 2.) According to the Examiner and the Requester, the above-noted limitation of

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

claim 2 is disclosed at page 163 in connection with the "My Email Express" hyperlink that allows for sending of an email message. (RAN, 14; Req. Resp. Br., 9.)

In challenging the anticipation rejection of claim 2, the Patent Owner is of the view that ICQ "does not disclose the server providing a message entry interface [.]" (PO App. Br., 15) (emphasis in original). Specifically, the Patent Owner argues that the "My Email Express" option in ICQ is provided by a user's own computer rather than by the "interface server" and, as a result, the "by said interface server computer" aspect of claim 2 is absent from the disclosure of ICQ at page 163. (PO App. Br., 13-14; PO Reb. Br., 9-10.)

Having reviewed the respective positions of the Examiner (and Requester) and the Patent Owner, we are unpersuaded that the portion of ICQ on which the Examiner relies discloses the features required by claim 2. In that regard, it simply is not evident where ICQ sets forth that the operability associated with the "My Email Express" control is accomplished by the interface server computer itself. The discussion of "My Email Express" at page 163 does not convey that the specific function of that component is performed by an interface server computer.

We are cognizant of the Requester's view that because the software that creates the "My Email Express" control may initially be downloaded from the ICQ servers, that is sufficient to meet claim 2. (Req. Resp. Br., 9.) We, however, do not share that view. Claim 2 expressly requires that the message entry interface is provided by the interface server computer "in response to activation of said second control." It does not follow that an

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

initial download of software from the ICQ server which ultimately creates
the "My Email Express" on a user's computer control means that a message
interface is provided by the server computer "in response to" activation of
that control.

Accordingly, on the record before us, we are unpersuaded that the
Examiner has established adequately that ICQ discloses all the features of
claim 2. We, therefore, <u>do not sustain</u> the rejection of claims 2, 8, 13, and
14 as anticipated by ICQ.

### iii. Claims 3 and 9

Claim 9 depends from claim 3. Claim 3 depends from claim 1 and
adds the feature: "further comprising the step of providing by said interface
server computer a comment entry interface in response to activation of said
first control." (2010 PO Amend, 2.)

The dispute between the parties with respect to claim 3 is similar in
nature to that discussed above in connection with claim 2. Namely, claim 3
similarly requires that a comment entry interface is provide "by said
interface server computer" in response to the activation of a control, in this
case, a first control. The Examiner relied upon ICQ's disclosure of a
"Guestbook" control option as constituting the first control. (RAN, 14.)

As discussed above in connection with claim 1, we agree with the
Examiner that ICQ's "Guestbook" constitutes a first control that provides a
comment entry interface. However, similar to our analysis above with
respect to claim 2, we are unpersuaded that the operation of the "Guestbook"
control is necessarily performed "by said interface server computer."
Although the Examiner has made that assertion, lacking from the record

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

before us is suitable underlying support for the assertion. In that regard, it is
not apparent that the "Guestbook" functionality set forth, for instance, at
pages 203 of ICQ is accomplished by the interface server computer. As that
is an express requirement of claim 3, we <u>do not sustain</u> the Examiner's
rejection of claim 3 or claim 9 as anticipated by ICQ.

### iv. Claim 12

Claim 12 ultimately depends from claim 2. As discussed above with
respect to claim 2, we find that the Examiner has not established sufficiently
that ICQ discloses the features required by claim 2. Accordingly, for the
same reason, we <u>do not sustain</u> the rejection of claim 12 as anticipated by
ICQ.

### v. Claim 16

Claim 16 depends from claim 8 which depends from claim 2. The
Examiner has not accounted appropriately for the features of claim 2. We
<u>do not sustain</u> the rejection of claim 16 as anticipated by ICQ.

### vi. Claim 22

Claim 22 depends from claim 1 and adds the feature "wherein said
individual home page further comprises a link to a homepage of said
interface server computer." (2010 PO Amend., 5.) Thus, the claim requires
that an individual's home page incorporate a link to a homepage of the
interface server computer. The Examiner contends that the above-noted
feature is satisfied by disclosure in ICQ at page 162 directed to a "My ICQ"
link (RAN, 48), which is reproduced below:

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

> My ICQ: Links visitors can click (if they are ICQ members) to
> add you to their Contact lists, invite you for a chat, and learn
> about you in the White pages.

We do not discern where the above-quoted portion sets forth that the link of
a homepage is one characterized as being "of said interface server
computer." The Examiner provides no elucidation in that regard. The
Requester generally takes the position that the reference in claim 22 of "a
homepage" encompasses any homepage, including that of the "My ICQ"
link. (Req. Resp. Br., 16.) That position, however, neglects to account for
the requirement that the homepage which is linked must be one regarded as
"of said interface server computer." In that regard, simply linking to any
homepage does not suffice.

For the foregoing reasons, we <u>do not sustain</u> the rejection of claim 22
as anticipated by ICQ.

### vii. Claims 23-25

Claim 23 depends from claim 1 and adds the limitation: "providing by
said interface server computer a user interface comprising a member search
data entry area for receiving search data for a member of said group of
members." (2010 PO Amend., 5.) The Examiner points to Figure 7-1 at
page 108 of ICQ as disclosing that feature. (RAN, 48.)

ICQ's Figure 7-1 depicts a "ICQ Global Directory Search Engine"
that allows for the entry of data in connection with a particular user or
member, *i.e.*, a member search data entry area. Lacking from Figure 7-1, or
other associated description of the Figure, however, is suitable explanation
conveying that it is the interface server computer so providing the data entry

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

area. Neither the Examiner nor the Requester directs us to any other disclosure in ICQ setting forth that the reference contemplates that it is the interface server computer providing the content of claim 23.

We <u>do not sustain</u> the rejection of claims 23-25 as anticipated by ICQ.

### c. de Hond

The Examiner rejected claims 1-5, 7-9, 11, 13-15, 20, 23, and 24 as anticipated by de Hond. The Patent Owner argues claims 3-5, 7, 9, 11, 13-15, 20, 23, and 24 collectively with claim 1. The Patent Owner submits separate arguments for each of claims 2 and 8.

*i. Claims 1, 3-5, 7, 9, 11, 13-15,
20, 23, and 24*

Claim 1 includes the following steps:

> allotting individual URLS to each of said plurality of members by associating an individual URL with each individual member of said plurality of members in said database system.

> associating an individual home page for each said individual member of said plurality of members with said individual URL allotted to said individual member in said database system[.]

(2010 PO Amend, 2.) According to the Patent Owner, the above-quoted steps require that it is a server that must operate to allot the URLs to members and associates individual home pages with the URLs. (PO App. Br., 15-16.) The Patent Owner concludes that de Hond thus does not disclose the above-noted steps of claim 1. We do not agree.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

At the outset, we do not agree that the allotting and associating actions set forth in claim 1 need be performed by any particular component, such as a server. In that regard, the claim does not impose restrictions as to how or by what entity the URLs are allotted or individual home pages are associated with the URLs. de Hond is directed to systems for designing databases and for displaying results of database searches. (de Hond, 1:8-12.) As a part of the system, a Web page is generated for each user that takes on the appearance of a virtual "house" composed of a series of graphical icons and which is accessible via the Internet. (*E.g., see id.* at Abstract; 3:35-60; Fig. 10.) A "URL" is understood by those of ordinary skill in the art as an address or location for a Web page on the World Wide Web, *i.e.*, the Internet. (*E.g., see id.* at 9:47-50.) The generation of individual Web accessible pages or virtual "houses" in de Hond for the users of its system is understood readily as conveying that a web location or "URL" has been allocated or allotted to each virtual "house."

Furthermore, with respect to the "associating" step, we observe that, as noted by each of the Examiner (RAN, 20) and the Requester (Req. Resp. Br., 10), de Hond discloses that, in one disclosed embodiment, "a link" to a user's home page may be added to the user's "house." (de Hond, 8:56-57.) That a link to a homepage is added to a user's virtual "house" conveys readily that an individual home page is associated with the Web location or URL that identifies the "house" in the manner that is required by claim 1.

The Patent Owner also contends that de Hond lacks disclosure of the "first control" that is required by claim 1. The Examiner relies on de Hond's component 126 as constituting a first control that allows for the submission

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

of a "comment(chat)" about an individual member.  (RAN, 19.)  Component
126 is described as an icon which may be "selected" by a user for opening a
"chat box" and which allows contact and communicate with the "owner" of
the virtual house.  (de Hond, 10:21-31.)  The Patent Owner attempts to draw
some distinction between the "chat" box disclosed in de Hond and a
"comment" as required by claim 1.  To that end, the Patent Owner alleges
that a "chat control" is not a "control for submitting a comment" stating:

> As one of skill in the art knows, a "chat control" is not a
> "control for submitting a comment", as claimed.  A "comment"
> is a statement that about [sic] a member that is stored and is
> visible to subsequent members who visit  a member's web
> page.  A "chat" is a real time conversation that is not stored and
> not visible to subsequent members who visit the member's web
> page.

(PO App. Br., 16.)  The Patent Owner does not explain meaningfully how it
arrives at its purported distinction between "chat" and "comment."  Neither
does it offer suitable evidence in support of that alleged distinction.  Indeed,
the alleged support is the very content of de Hond noted above concerning
the functionality of de Hond's icon 126 in allowing contact and
communication with the owner of the "house."  (*Id*. at 16-17.)  We are not
persuaded by the Patent Owner's speculative position that the contact and
communication functions attributed to the chat box accessed via icon 126 is
somehow distinguished from the "comment" submission set forth in claim 1.

Lastly, the Patent Owner also argues that de Hond lacks disclosure of
the step in claim 1 of "receiving by said interface server an online request
for said individual URL from a requesting source."  (*See id*. at 17; 2010
Amend., 2.)  That argument is also unpersuasive.  de Hond conveys that a

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

user of its system may request access to a particular virtual house through a
search or query submitted to server 12. (de Hond, 10:7-11:48; Fig. 10.) A
request submitted to server 12 for access to a virtual house would have been
appreciated by a skilled artisan as a request for the Web location, *i.e.*, the
URL.

     Upon consideration of the record, and for the foregoing reasons, we
do not discern that de Hond lacks disclosure of any features required by
independent claim 1 or dependent claims 3-5, 7, 9, 11, 13-15, 20, 23, and 24.
Accordingly, we <u>sustain</u> the rejection of those claims as anticipated by de
Hond.

*ii. Claim 2*

     Claim 2, which depends from claim 1, requires that a message entry
interface is provided by an interface server computer in response to the
activation of a second control. In rejecting claim 2, the Examiner relies on
content of de Hond at column 10, lines 32-35. (RAN, 19.) That portion of
de Hond describes an "icon" 128 appearing on a screen depicted, for
instance, at Figure 10, which allows a user to send an e-mail to the owner of
a "house" by selecting or clicking the icon. According to the Patent Owner,
the e-mail functionality that arises by selecting icon 128 is not disclosed in
de Hond as being attributed to a server. (PO App. Br., 17-18.)

     de Hond discloses that "Figs. 6-16 illustrate screens generated by the
server 12 in one specific embodiment of the invention, in which the Internet
is used to connect the server 12 to the clients." (de Hond, 8:58-60.) Thus,
the screen of Figure 10 which depicts icon 128 is one that is "generated" by
server 12, and it is from that screen that clicking the icon provides an e-mail

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

interface, *i.e.*, a message entry interface.  Although, the Patent Owner characterizes de Hond's disclosure as being limited to functionality of a user's local computer rather than a server, the Patent Owner does not adequately account for the above-noted disclosure of de Hond.  It simply is not evident why a server which generates the screen on which icon 128 resides does not "provide" the icon and its associated functionality.

In light of the record before us, we are persuaded that de Hond discloses all the features of claim 2.  We <u>sustain</u> the rejection of that claim as anticipated by de Hond.

### iii. Claim 8

Claim 8 depends from claim 2 and adds the limitation: "further comprising the step of receiving by said interface server computer a message entered into said message entry interface."  In rejecting claim 8, the Examiner makes reference to de Hond at column 12, lines 21-25.  (RAN, 21.)  The noted portion of de Hond is reproduced below:

> FIG. 15 illustrates a screen using which a user can check his or her e-mail. The screen includes a graphical representation 146 of a mailbox, an area 148 where new mail items are listed or indicated, and an area 150 where items that already have been read are listed or indicated.

Thus, the above-noted portion describes the content of de Hond's Figure 15 illustrating a screen by which a user may check their e-mail.  Like claim 2, the Patent Owner is generally of the view that de Hond does not describe that it is a "server" which performs the functions set forth in claim 8.  (PO App. Br., 18.)  Yet, as discussed above, de Hond clearly sets forth that server 12 may generate the noted screen. (de Hond, 8:57-59.)  In

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

generating the screen, server 12 is understood reasonably as providing the message entry interface that is associated with the screen. The Patent Owner does not address de Hond's disclosure concerning the role of server 12 in creating the screen that is depicted in Figure 15. The Patent Owner also does not explain why a message that is inputted into the message entry interface so generated by the screen is not understood as being received in some fashion by the server.

Accordingly, after due consideration of the arguments presented by the Patent Owner, we are unpersuaded that de Hond lacks disclosure of the features set forth in claim 8. We, therefore, <u>sustain</u> the rejection of claim 8 as anticipated by de Hond.

### d. Robertson

The Examiner rejected claims 1-3, 7-9, 11, 20, 22, and 26 as anticipated by Robertson. Robertson is a paper titled "Web-Based Collaborative Library Research." The paper describes a system facilitating interaction between a company's employees and library researchers through a company's intranet. (Robertson, Abstract.)

Claims 1 and 26 each require the following steps:

allotting individual URLS to each of said plurality of members by associating an individual URL with each individual member of said plurality of members in said database system.

associating an individual home page for each said individual member of said plurality of members with said individual URL allotted to said individual member in said database system[.]

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

(2010 PO Amend, 2.)  According to the Examiner, those steps are disclosed
in Robertson at page 155, column 1, lines 3-4 of the first full paragraph in
that column.  (RAN, 24.)  That paragraph of Robertson is reproduced below:

> Staff members and library clients both have their own areas on
> the website which they can get to by clicking the "Staff" or
> "Clients" book icons.  Each staff member and each client has
> his or her own page.  Researchers and clients can get to a list of
> ongoing research from their individual pages.  They can also
> get from their pages to details of their research usage to date.
> Clients can use their pages to initiate research requests.

The lines of the above-noted paragraph referenced by the Examiner
express merely that staff members and clients have their own page coupled
with disclosure that "ongoing research" may be accessed from individual
pages.  Although the Examiner and the Requester (Req. Resp. Br., 12)
generally contend that such disclosure satisfies the pertinent "allotting" and
"associating" steps that are required by claims 1 and 26, we are not
persuaded that the contentions are correct.  It is not apparent how the noted
statements in Robertson convey that individual URLs have been allotted to
multiple members of a database system and individual home pages are
associated with the allotted URLs, as is required by the claims.

Accordingly, after due consideration of the respective positions of the
Patent Owner and the Examiner (and Requester), we are not persuaded that
Robertson is properly viewed as an anticipatory disclosure for claims 1 and
26.  We, therefore, do not sustain the rejections of those claims or dependent
claims 2, 3, 7-9, 11, 20, and 22 as anticipated by Robertson.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

### e. ICQ 98a

The Examiner rejected claims 1, 2, 8, 13, and 14 as anticipated by ICQ 98a. In reviewing the disclosure in ICQ 98a, we observe that it is similar to the disclosure of ICQ. That is a position also shared by the Patent Owner. (PO App. Br., 22.)

#### i. Claim 1

In connection with claim 1, the Patent Owner makes essentially the same arguments that it did with respect to the anticipation rejection involving ICQ. Having reviewed the record, including the assessment of the content of ICQ 98a provided by the Examiner (RAN, 28-30) and the Requester (Req. Resp. Br., 13-14), and for largely the same reasons discussed above in conjunction with ICQ, we are persuaded that ICQ 98a anticipates claim 1. Accordingly, we sustain the rejection.

#### ii. Claims 2, 8, 13, and 14

With respect to the rejection of claim 2, we observe that the Examiner focuses on content of ICQ 98a appearing on page 248 and directed to a feature termed "E-Mail Express." (RAN, 30.) The functionality and configuration of ICQ 98a's "E-mail Express" is similar to that of ICQ's "My E-mail Express." As discussed above, we were not persuaded that ICQ's "My E-mail Express" performed the steps "by said interface server computer." (See supra.) We are similarly not persuaded when it comes to ICQ 98a's "E-Mail Express."

Accordingly, we do not sustain the rejection of claim 2 as anticipated by ICQ 98a. We also do not sustain the anticipation rejection of claims 8, 13 and 14, which ultimately depend from claim 2.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

### 5. The Obviousness Rejections

The Examiner adopted seven grounds of rejection based on obviousness (numbered (10)-(16) in this opinion). In particular, claims 1-15 were rejected over: **(10)** GeoCities and de Hond; and **(11)** ICQ and de Hond. Claims 1-5, 7-9, 11, and 13-15 were rejected over: **(12)** de Hond and Chandra; **(13)** de Hond and Shane; **(14)** Donath and de Hond; and **(15)** ICQ 98a and de Hond. Claim 17 was rejected over **(16)** ICQ and O'Neal.

### a. Grounds (10)-(15)

All of these involved rejections include one or more of GeoCities, de Hond, ICQ, and ICQ 98a. The Patent Owner's arguments challenging these rejections are, in large part, premised on assertions that each of those references does not disclose features of claim 1. (*See* PO App. Br., 25-27.) As discussed above, we are not in agreement with the Patent Owner in that regard. A prima facie case of obviousness is established when the prior art itself would appear to have suggested the claimed subject matter to a person of ordinary skill in the art. *In re Rinehart*, 531 F.2d 1048, 1051 (CCPA 1976). As we are not persuaded that any of GeoCities, de Hond, ICQ, and ICQ 98a is deficient in disclosing the subject matter claim 1, we are also not persuaded that the Examiner has failed to present a prima facie case of obviousness as to that claim.

We note that with respect to claim 2, we determined that each of GeoCities, ICQ, and ICQ 98a does not convey disclosure of features required by that claim. We also made such a determination as to claim 3 in connection with the rejections involving GeoCities and ICQ. In that regard, we concluded that although the references disclose the presence of an

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

interface server computer and also first and second controls, it was not apparent that it was the servers "providing" a message or comment entry interface in response to activation of those controls so as to anticipate those claims. (*See supra.*) The involved rejections here, however, are based on obviousness.

In an obviousness analysis, it is not necessary to find precise teachings in the prior art directed to the specific subject matter claimed because inferences and creative steps that a person of ordinary skill in the art would employ can be taken into account. *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 418 (2007). Thus, even if the prior art is not explicit that a server computer performs the steps required by claims 2 and 3, that does not end the obviousness inquiry. GeoCities, ICQ, de Hond, and ICQ 98a readily convey that a server computer interacts or interfaces with a user's computer to provide functional content on a Web page. For instance, GeoCities expresses that a "special program" residing on a Web server processes certain HTML forms that also serve as message entry interfaces. (GeoCities, 237.) Similarly, de Hond conveys that it is a server that generates content of a user's Web page. (de Hond, 8:58-60.) It is apparent also that functions, such as those specified in claim 2 and 3 in which a message entry interface is provided upon activation of controls, are performed by a computer. Furthermore, none of the references specifies that any one particular computer must be operable to perform those functions to the exclusion of some other computer.

Review of content of the involved prior art reveals that the level of ordinary skill in the art is sufficiently high to allocate computer resources

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

with the goal of providing Internet-based communication systems, such
those disclosed in each of GeoCities, de Hond, ICQ and ICQ 98a. A person
of ordinary skill in the art, who is also one of ordinary creativity, *KSR Int'l
Co.*, 550 U.S. at 421, would have appreciated that the computers that are the
Web server computers are viable options for performing the steps required
by claims 2 and 3. Indeed, in our view, a skilled artisan reasonably would
have had such an appreciation with respect to all of the steps that are
required by claims 1-15.

We have thoroughly reviewed the record before us. In that regard, we
have assessed the content of the prior art and carefully evaluated the
respective positions of the Patent, the Examiner, and the Requester. Based
on our review, we conclude that an adequate prima facie case of obviousness
has been established in connection with the rejections numbered in this
opinion as (10)-(15).

### b. Ground (16) ICQ and O'Neal

Claim 17 stands rejected over ICQ and O'Neal. Claim 17 depends
from claim 16 which, in turn, depends from claim 8. Claims 16 and 17 are
reproduced below:

> 16. The method of claim 8 further comprising the step of
> sending by said interface server computer a message to a
> telephone of said individual member in response to receiving
> said message entered into said message entry interface.

> 17. The method of claim 16 wherein said message sent by said
> interface server computer to said telephone comprises a voice
> message.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

(2010 PO Amend., 4.) Thus, claim 17 requires that in response to a message entered into the message entry interface, a voicemail message is sent to a telephone. ICQ discloses that a server computer may send a message to an "Internet telephony session." (ICQ, 280-281.) Although during prosecution of this *inter partes* reexamination proceeding, the Requester has likened an Internet telephony session to a telephone, we share the Patent Owner's view that such a session is not a "telephone" per se (*see* PO App. Br., 30-31). In that regard, ICQ expresses that although an "Internet telephony session" operates "like a telephone," it is an application associated with a computer rather than an actual telephone. (*See* ICQ, 275.) However, the Requester and the Examiner have also pointed to O'Neal as accounting for the features of claim 17 pertaining to sending a voicemail message to a telephone.

O'Neal is directed to an "apparatus and method for device independent messaging notification." (O'Neal, Title.) O'Neal describes a system in which a Web server notifies a user when a message sent to the user has been received. (O'Neal, Abstract.) O'Neal also describes that a "text/speech converter" forms part of the system. A portion of O'Neal is reproduced below explaining the operation of the text/speech converter:

> The text/speech converter 426 provides the ability to convert text, such as email, into digital audio format, or audio format into text. Operationally, this allows a user to have email converted to voice information for delivery to a telephone, for example.

(O'Neal, 8:60-64.) In light of the above-noted disclosure in O'Neal, the Requester (Req. Resp. Br., 17) and the Examiner (RAN, 52-53) contend that a person of ordinary skill in the art would have realized that a telephone is

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

type of communication device that is also available to relay voice messages
that have been converted from text. Those contentions are persuasive.

We are cognizant of the Patent Owner's assertion that no "legitimate
motivation" has been articulated for combining the teachings of ICQ and
O'Neal. (PO Reb. Br., 19.) We, however, do not agree with that assertion.
ICQ discloses a communication system designed such that parties may
communicate with one another via various messaging tools. O'Neal
provides that such messaging tools known and available in the art include
conversion of a text based message into an audio format, such as a voice
message, for delivery to a telephone. In addressing design needs in the art, a
skilled artisan has good reason to pursue the options that are known and
within his or her technical grasp. *See KSR Int'l Co. v. Teleflex Inc.,* 550 U.S.
398, 421 (2007). Here, a person of ordinary skill in the art would have
adequate reason to incorporate into ICQ's system a known communication
format that involves the delivery of a voice mail message to a telephone, as
is disclosed in O'Neal. The Patent Owner's position to the contrary is
unpersuasive.

We conclude that the Examiner has established an adequate prima
facie case of the obviousness of claim 17 based on the teachings of ICQ and
O'Neal.

### c. Secondary Considerations of Non-Obviousness

Once the Examiner has established a prima facie case of obviousness
the burden shifts to the Appellant to come forward with argument or
evidence of secondary considerations of non-obviousness that would
overcome that prima facie case. *In re Oetiker*, 977 F.2d 1443, 1445 (Fed.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

Cir. 1992). Here, the Patent Owner contends that it has provided evidence in the record tending to show the commercial success of the claimed invention. (PO App. Br., 7-8; PO Reb. Br., 5-6.) The Patent Owner makes the following representations in its Appeal Brief regarding the evidence on which it relies:

> [T]he evidence that ties the claimed invention to the requester's commercial success was included in the RAN itself (paragraph G of requesters response (incorporated in the RAN) and owners Motion for Summary Judgment attached thereto (Exh. Q). Further it is common knowledge that the commercial success of requester is a result of users being able to send messages to and post comments about member on member's home pages using the claimed invention.

(PO App. Br., 7-8.) In its Rebuttal Brief, the Patent Owner also makes reference to "admissions" by the Requester allegedly made in the Requester's "IPO ("Initial Public Offering") prospectus filed on February 1, 2012, which is available from the Security and Exchange Commission's website at www.sec.gov. ("Prospectus")." (PO Reb. Br., 5.) Those alleged "admissions" are directed apparently to general statements concerning a commercial product of the Requester and constitute the following statements:

> Our mission is to make the world more open and connected.

> People use Facebook to say connected with their friends and family, to discover what is going on in the world around them, and to share and express what matters to them to the people they care about.
> * * *

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

> Our users generated an average of 2.7 billion Likes and
> Comments per day during the three months ended December
> 31, 2011.

(*Id.*) Thus, the "evidence" on which the Patent Owner relies to make out its
non-obviousness position based on commercial success is: (1) some portion
of the RAN; (2) the Patent Owner's Motion for Summary Judgment in
District Court (Ex. Q); (3) a general statement of "common knowledge"; and
(4) alleged statements made by the Requester in a "Prospectus" that is not of
record in this proceeding.

Commercial success is relevant only if it flows from the merits of the
invention claimed. *Sjolund v. Musland*, 847 F.2d 1573, 1582, 6 USPQ2d
2020, 2028 (Fed. Cir. 1988). Furthermore, a "nexus" is required between
the merits of the claimed invention and any objective evidence of
nonobviousness offered, if that evidence is to be given substantial weight
enroute to a conclusion on obviousness. *Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530, 1539, 218 USPQ 871, 879 (Fed. Cir. 1983); *See also Ormco
Corp. v. Align Tech.*, Inc. 463 F.3d 1299, 1311-12 (Fed. Cir. 2006)
("Evidence of commercial success, or other secondary considerations, is
only significant if there is a nexus between the claimed invention and the
commercial success.") Moreover, "if the commercial success is due to an
unclaimed feature of the device, the commercial success is irrelevant. So
too if the feature that creates the commercial success was known in the prior
art, the success is not pertinent." *Ormco Corp.*, 463 F.3d at 1312; *see also
In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996) ("[Commercial] success is
relevant in the obviousness context only if there is proof that the sales were a
direct result of the unique characteristics of the claimed invention-as

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

opposed to the economic and commercial factors unrelated to the quality of the patented subject matter."

At the outset, it is not apparent from the record before us on what factual basis the Patent Owner concludes that actual commercial success of some product has resulted. In that regard, lacking from the record in this proceeding is credible evidence demonstrating the extent of commercial success that the Patent Owner basis its position of non-obviousness due to secondary considerations. For instance, a primary consideration in demonstrating actual commercial success are if sales of the claimed invention have produced a substantial share of the marketplace. *See In re Huang*, 100 F.3d at 140. Here, lacking from the record is what share of the marketplace has been acquired due to the claimed invention of the '122 Patent.

In any event, also notably lacking from the record is establishment of a "nexus" between the invention of the Patent Owner's claims and any commercial success. The Patent Owner's general and unsubstantiated assertion pertaining to "common knowledge" that commercial success of a product of the Requester is due to the claimed invention simply is unavailing. So too is the Patent Owner's reliance on alleged statements made by Requester that its commercial product is successful in allowing friends and family to "stay connected." Even were we to assume that the statements are evidence in this proceeding, it is not apparent what nexus is established with the claimed invention through a general theory of "connection" between persons. The prior art, as has been assessed above, is replete with disclosure of communication systems available over the Internet

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

that allow for persons to remain "connected" through various known communication tools. There is no suitable evidence of record tending to establish that any commercial success attributed to the Requester is due to the claimed features of the Patent Owner's invention.

We have duly considered the Patent Owner's position that it has established non-obviousness based on evidence of commercial success. In that regard, we have weighed the evidence offered by the Patent Owner in support of its position alongside the evidence of obviousness of claims 1-5 and 17. On balance, we conclude that the strong evidence of obviousness outweighs the weak evidence of non-obviousness.

### d. Conclusion – Obviousness

In conclusion, we <u>sustain</u> the obviousness rejections numbered (10)-(16) in this opinion.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

B.    REQUESTER'S CROSS-APPEAL

At issue with respect to the Requester's Cross-Appeal is the Examiners decision not to adopt eight grounds of rejection based on anticipation (numbered (18)-(26) in this opinion) and twenty-five grounds based on obviousness (numbered (27)-(50)).

1.    The Non-Adopted Anticipation Rejections

The anticipation rejections that were not adopted involve each of ICQ, ICQ 98a, Robertson, de Hond and GeoCities.

**a. ICQ**

The Examiner declined to adopt proposed rejections of claims 5, 10, 11, and 15 as anticipated by ICQ.

*i. Claim 10*

Claim 10 is dependent on claim 9, which is dependent on claim 3.  As discussed above, we do not sustain the rejection of claim 3 and 9 as anticipated by ICQ.  Accordingly, we do not find that the Examiner erred in declining to reject claim 10 as anticipated by ICQ.

We <u>sustain</u> the Examiner's decision not to adopt the proposed rejection of claim 10 as anticipated by ICQ.

*ii. Claim 5*

Dependent claim 5 is reproduced below:

5.    The method of claim 1 wherein said individual home page further comprises rating information associated with said individual member.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

(2010 PO Amend., 3.)  Thus, claim 5 requires that an individual's home page comprises "rating information" associated with the member.  In declining to reject claim 5 as anticipated by ICQ, the Examiner contends that ICQ does not disclose "rating information" about a member which is conveyed via a comment.  (RAN, 36-37.)  The Patent Owner agrees with the Examiner.  (PO Resp. Br., 2-3.)

The Requester maintains that the required rating information is supplied via ICQ's "Guestbook" feature, which is a feature associated with the individual's home page.  (Req. App. Br., 7; Req. Reb. Br., 2.)  We agree with the Requester.

As pointed out by the Requester, ICQ discloses that its "Guestbook" feature allows for submission of comments by a visitor of a member's Web page directed to "what visitors like and don't like" about the page.  (ICQ, 203.)  While the Patent Owner characterizes that disclosure as directed to information about a member's Web site and something distinguished from rating information associated with a member (PO Resp. Br., 2), the Patent Owner does not explain meaningfully on what basis it draws a distinction. A visitor's assessment as to what he or she likes or dislikes about the Web page of a given member is considered reasonably as rating information "associated" with the member.  In that regard, the term "associated" is of suitable breadth that it does not, in our view, convey a restriction on the specified information so as to exclude the informational content of comments which is contemplated in ICQ.  Furthermore, as discussed above in conjunction with ICQ as applied in anticipating claim 1, we find that the

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

"Guestbook" is a feature that is viewed reasonably as part of a member's
Web page.

In light of the record before us, we are not persuaded that the
Examiner was correct in declining to adopt the rejection of claim 5 as
anticipated by ICQ that was proposed by the Requester in its Request for
*Inter Partes* Reexamination. We, therefore, <u>do not sustain</u> the Examiner's
decision not to adopt that rejection. **Our decision effectively constitutes a
new ground of rejection and is hereby designated as such.** *See* **37 C.F.R.
§ 41.77(b).**

### *iii. Claims 11 and 15*

Claims 11 and 15 also introduce steps concerning "rating
information." Those claims are reproduced below:

> 11.    The method of claim 7 further comprising the step of
> receiving by said interface server computer rating information
> entered into said rating entry interface.
>
> * * *
>
> 15.    The method of claim 1 further comprising the step of
> displaying rating information for said individual member by
> said interface server computer on said individual home page.

(2010 PO Amend., 3-4.) The Examiner declined to reject claims 11 and 15
as anticipated by ICQ on the basis that it lacks disclosure of entering rating
information into an entry interface. (RAN, 37.) As discussed above with
respect to claim 5, we do not agree with the Examiner in that regard.
Comments expressing what a visitor likes or dislikes about a member's Web
page are understood reasonably as constituting rating information.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

The Patent Owner also argues that the Examiner's decision should be maintained on the theory that ICQ's "Guestbook" does not form part of an individual member's Web page. (PO Resp. Br., 2-3.) As we have discussed *supra*, we do not agree with that argument.

After evaluation of the record, we <u>do not sustain</u> the Examiner's decision not to adopt the anticipation rejection of claims 11 and 15 based on ICQ as was proposed by the Requester in its Request. **Our decision constitutes a new ground of rejection of claims 11 and 15.** *See* **37 C.F.R. § 41.77(b).**

### b. ICQ 98a

The Examiner decided not to reject claims 4, 19, and 22-26 as anticipated by ICQ 98a. (Rejections numbered in this opinion as (19), (21), (22), (23), and (26).)

### i. Claims 12 and 19

Claims 12 and 19 depend from claim 8, which depends on claim 2. As noted *supra*, we do not sustain the rejection of claims 2 or 8 as anticipated by ICQ. Correspondingly, we do not discern error in the Examiner's decision not to reject claims 12 and 19 as so anticipated. We <u>sustain</u> the decision.

### ii. Claim 4

Claim 4 is dependent on claim 1. Claim 4 adds the feature: "wherein said individual home page further comprises a link to an existing website of said individual member." (2010 PO Amend., 2.) In deciding not to reject claim 4, the Examiner offers the following statements:

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

> As to claim 4, while ICQ 98a discloses a link to ICQ websites of said individual use, ICQ 98a fails to disclose a link to an existing (i.e., non-ICQ) website of said individual user. Accordingly, ICQ 98a fails to disclose each and every limitation of claim 4 and does not anticipate the claim.

(RAN, 41.) Thus, the Examiner seemingly imposes a "non-ICQ" restriction upon the "existing website" limitation of claim 4. It is not apparent, however, on what basis the Examiner does so. We do not discern why the "existing website" may not be one that is associated in some context with ICQ. In that regard, we share the Requester's view that there is no requirement in the claim or in the specification of the '122 Patent that the "existing website" need be provided by an entity other than ICQ. (*See* Req. App. Br., 8.)

The Requester directs us to content of ICQ 98a disclosing that a link characterized as "view my ICQ page" may be supplied and provides a link which accesses a website that is in existence. (*Id.*; *see also* ICQ 98a, 254.) Although the Patent Owner takes the position that the above-noted link somehow does not link to an "existing website" (PO Resp. Br., 3), we are not persuaded that the Patent Owner's position is correct.

Accordingly, for the foregoing reasons, we <u>do not sustain</u> the Examiner decision not to adopt the Requester's proposed rejection of claim 4 as anticipated by ICQ 98a. **Our decision constitutes a new ground of rejection of claims 11 and 15.** *See* **37 C.F.R. § 41.77(b).**

### iii. Claim 22

It is not evident where in the record the Examiner has addressed or otherwise considered the Requester's proposed rejection of claim 22 as

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

anticipated by ICQ 98a. Claim 22 depends from claim 1 and adds the
following limitation: "wherein said individual home page further comprises
a link to a homepage of said interface server computer." (2010 PO Amend.,
5.) As discussed above, we sustain the Examiner's decision to reject claim 1
as anticipated by ICQ 98a. The Requester provides the following
explanation with respect to claim 22:

> ICQ Ver. 98a further discloses an individual home page
> that further comprises a link to a homepage of the interface
> server computer. ICQ Ver. 98a discloses a series of tools
> provided by ICQ for building personal homepages. One of
> these tools is a button entitled "User for User" which, when
> clicked, brings the user to an ICQ homepage providing help.
> (*See* ICQ Ver. 98a, p. 259 ("User For Use – Use this button if
> you own a site that provides ICQ-related help."); *id.* at p. 267
> ("You can create an ICQ-web link which is stored on your
> home page.").) For at least these reasons, therefore, Claim 22
> should be rejected as anticipated by ICQ Ver. 98a.

(Req. App. Br., 27.) We agree with the Requester's assessment of the "User
for User" feature that is set forth in ICQ 98a and also conclude that it is a
link to a homepage of the server. The Patent Owner contends that ICQ 98a
fails to account for the requirements of claim 22 because the noted "User for
User" button is a feature that is "manually" added by a user during the
creation of their homepage. (PO Resp. Br., 14.)

The Patent Owner's contention, however, is misplaced. That the link
may be added initially added by a user to their homepage at one phase of a
page's construction does not mean that the link, once added, is somehow
deficient to constitute a link to a homepage of a server. We reject the Patent
Owner's contention.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

To the extent that the Examiner decided not to adopt the above-noted
rejection of claim 22 as anticipated by ICQ 98a, we do not sustain that
decision. **Our decision constitutes a new ground of rejection of claim 22.**
*See* **37 C.F.R. § 41.77(b).**

### iv. Claims 23-25

As discussed above, claim 23, on which claims 24 and 25 depend,
requires that an "interface server computer" provides "a user interface
comprising a member search data entry area for receiving search data for a
member of said group of members." (2010 PO Amend., 5.) The Requester
contends that content of ICQ 98a concerning a "Home Page Gallery" and a
"Personal ICQ Page" account for the features of claims 23-25. (Req. App.
Br., 28.)

We are not persuaded that the Requester has established that ICQ 98a
anticipates claims 23-25. That is, the Requester did not direct us to
disclosure in ICQ 98a setting forth that it is an interface server computer
providing the content of claim 23.

The Examiner did not adopt a rejection of claims 23-25 as anticipated
by ICQ 98a. We <u>sustain</u> the Examiner's decision.

### iv. Claim 26

Claims 26 is an independent claim. Although claim 26 is, in many
respects, similar in scope to claim 1, claim 26 deviates from claim 1 in
specifying that the step of "creating an individual home page" for each
member is accomplished, specifically, "without assistance of said member."
(2010 Amend., 5.) We do not discern that the Examiner has addressed the

proposed rejection of claim 26 as anticipated by ICQ 98a. It is the requirement that the member provides no "assistance" in the creation of the member's individual home page that lies at the heart of the dispute between the Requester and the Patent Owner as to whether the above-noted rejection should have been made.

In accounting for the "without assistance" aspect of claim 26, the Requester relies on the content of ICQ 98a at page 263 concerning description of "Services for List Masters." (Req. App. Br., 15; Req. Reb. Br., 9.) The Patent Owner submits that the list of services disclosed at page 263 does not include the creation of an individual member's home page in a manner that is without assistance from the member. (PO Resp. Br., 7-9.)

It is clear that the services that page 263 of ICQ 98a attributes to the "List Master" functionality are generally contemplated as the creation of ICQ pages. ("Build an ICQ Page, enables you to create an ICQ page and submit it to the people at ICQ.") However, much less clear is whether ICQ 98a itself contemplates that the disclosed pages are an individual member's home page created without the assistance of the member. That, however, is what is unequivocally required by claim 26. Although the Requester is of the view that required disclose lies somewhere on page 263, the Requester neglects to support adequately that view. A person of ordinary skill in the art may, through intuition or common sense, conclude that a "List Master" in creating an ICQ page may derive that another member's home page may be created without their input. However, that inquiry is not one properly undertaken when resolving anticipation.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

Therefore, we are not persuaded that claim 26 is anticipated by ICQ 98a. We <u>sustain</u> the Examiner's decision not to enter a corresponding ground of rejection.

### c. Robertson

The Examiner did not adopt rejection of claims 4 and 12 as anticipated by Robertson. Claims 4 and 12 ultimately depend from claim 1. As noted above, we are not persuaded that claim 1 is rejected properly as anticipated by Robertson. Therefore, we <u>sustain</u> the Examiner's decision not to reject claims 4 and 12 as anticipated by Robertson.

### d. de Hond

The Requester proposed a rejection of claim 25 as anticipated by de Hond. Claim 25 depends from claim 24, which depends from claim 23, which depends from claim 1. The Examiner adopted rejections of claims 1, 23, and 24 as anticipated by de Hond but did not adopt a corresponding rejection of claim 25. The record is less than clear as to why the Examiner did not adopt such a rejection of claim 25. As noted above, we sustain the rejections of claims 24, 23, and claim 1 as anticipated by de Hond.

Claim 25 adds the limitation: "further comprising the step of: providing by said server links to individual home pages of a plurality of said members identified by said server as possible matches for said search data received in said search data entry area." (2010 Amend., 5.) The Requester submits that the feature added by claim 25 is set forth in de Hond at columns 5 and 6. (Req. App. Br., 29.) Those portions of de Hond disclose a "search procedure" in which a user or visitor may attempt to make connection with one or more users, *i.e.*, "residents." (de Hond, 5:30-40.) That search

59

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

procedure entails the input of various personal information about the resident, such as gender, age, and zip code. (*Id.* at 5:41-47.) de Hond's server 12 queries a database of the system and matches persons or residents who meet the criteria called for in the search procedure. (*Id.* at 5:48-57.) The residents that match the criteria are then displayed to the visitor as "thumbnails" of houses arranged along a virtual "street." (*Id.* at 6:34-36.)

The Requester and the Patent Owner dispute whether de Hond's "thumbnails" constitute the "links to individual home pages of a plurality of said members" required by claim 25. According to the Requester, they are. (Req. App. Br., 29.) According to the Patent Owner, they are not. (PO Resp. Br., 14.) We agree with the Requester.

As shown, for instance in Figure 10, de Hond characterizes the screen display that is a resident's house as being a "Homepage." Thumbnail icons that may be selected to deliver a visitor, in a virtual context, to a resident's "house" that is expressed as being a "Homepage" are, in our view, appreciated readily as links to individual home pages of a plurality of members. We observe also that de Hond expressly contemplates that in an embodiment of its invention "a link to the resident's home page (if he has one) is added to his house." (de Hond, 8:56-57.)

Therefore, for the foregoing reasons, we are not persuaded by the Patent Owner that claim 25 presents content that distinguishes the claim from the disclosure of de Hond. Accordingly, we are of the opinion that the Examiner should have adopted the rejection of claim 25 as anticipated by de Hond as was proposed by the Requester. Because the Examiner seemingly decided not to adopt such a rejection, we do not sustain the Examiner's

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

decision. **Our decision constitutes a new ground of rejection of claim 25.**
*See* **37 C.F.R. § 41.77(b).**

### e. GeoCities

The Requester contends that GeoCities anticipates claim 26. At issue
again with respect to that claim is the requirement that an individual
member's home page be created "without assistance of said member." The
Requester points to discussion in GeoCities directed to the creation of "fan
pages" that are Web pages created, for instance, by fans of celebrities, where
the content of the page is directed to the celebrity. (Req. App. Br., 14-15;
Req. Reb. Br., 8-9.) The Patent Owner submits that such "fan pages" are not
an individual member's home page created without assistance by the
member. (PO Resp. Br., 6-7.)

After careful consideration, we agree with the Patent Owner. It is
simply not apparent that the "fan pages" disclosed in GeoCities account for
the requirement of claim 26 in connection with the creation of an individual
member's home page. The Examiner did not adopt an anticipation of claim
26 based on GeoCities. We <u>sustain</u> the Examiner's decision not to adopt
such a rejection.

### 2. The Non-Adopted Obviousness Rejections

The Requester submits that various grounds of rejection proposed in
connection with claims 16-19, 21, and 23-26 (Grounds of Rejection
numbered in this opinion as (27)-(50).) Neither the RAN nor the Examiner's
Answer indicates that any of those rejections have been adopted by the
Examiner.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

### a. Ground (27) – ICQ and O'Neal

The Requester proposed that claim 16 should be rejected over ICQ and O'Neal. As discussed above in connection with Ground (16), we have concluded that claim 17 is properly rejected as unpatentable over ICQ and O'Neal. Claim 17 depends from claim 16. For similar reasons set forth *supra* with respect to claim 17, we are persuaded that claim 16 should also have been rejected.

Accordingly, we conclude that the Examiner should have entered the ground of rejection proposed by the Requester pertaining to claim 16 as unpatentable over ICQ and O'Neal. **Our decision in that regard constitutes a new ground of rejection.** *See* **37 C.F.R. § 41.77(b).**

### b. Ground (28) – GeoCities and O'Neal

This ground was proposed by the Requester for claims 16 and 17. As discussed above, claim 16 depends from claim 8 and adds a step directed to sending a message to a telephone in response to entry of a message into a message entry interface. Claim 17 adds to claim 16 that the message is a voice message.

With respect to the GeoCities and O'Neal combination, we have considered the Requester's arguments in favor of an obviousness determination (Req. App. Br., 21-22; Req. Reb. Br., 10) and the Patent Owner's arguments in opposition to such a determination (PO Resp. Br., 12). Throughout this opinion, we have relayed our view as to the disclosure of GeoCities and what one with ordinary skill in the art would have understood from that disclosure. In that regard, we are satisfied that a skilled artisan would have regarded claim 8 as obvious based on the

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

teachings of GeoCities. We are also satisfied that O'Neal discloses the
features added by claims 16 and 17.

In particular, O'Neal makes clear that message entered into a message
entry interface, *e.g.*, e-mail, may desirably be converted into a voice
message for delivery to a recipient. (O'Neal, 6:35-65.) O'Neal also
describes that delivery of the voice message may be to a telephone. (*Id*. at
8:60-64.) A person of ordinary skill and creativity in the art would have
recognized that conversion of a text-based based message in to an audio
voice message provides a beneficial flexibility in message delivery that
would apply to a variety of communication systems involving message entry
and delivery, such as that of GeoCities. Accordingly, we share the
Requester's view that it would have been obvious to combine O'Neal's
teachings with those of GeoCities to obtain the flexibility in messaging
arising from text to speech conversion.

For the foregoing reasons, we are persuaded that claim 16 and 17
would have been obvious based on GeoCities and O'Neal. Because the
Examiner did not adopt that ground of rejection as proposed by the
Requester, we do not sustain the Examiner's decision. **Our decision that
the rejection should have been applied to claims 16 and 17 constitutes a
new ground of rejection.** *See* **37 C.F.R. § 41.77(b).**

### c. Ground (29) - Robertson and O'Neal

The Requester also proposed a ground of rejection for claim 16 and 17
based on Robertson and O'Neal (29). Those claims ultimately depend on
claim 1. As we have conveyed above, we are not persuaded that Robertson
discloses the "allotting…" and "associating…" steps of claim 1. The

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

Requester's proposed rejection based on Robertson and O'Neal is not offered to remedy those deficiencies in Robertson.

Accordingly, we conclude that the proposed rejection of claims 16 and 17 based on Robertson and O'Neal does not account sufficiently for the features of those claims. The Examiner did not enter a rejection of claim 16 and 17 based on Robertson and O'Neal. We <u>sustain</u> that decision.

### d. Grounds (30)-(33)

Proposed grounds (30)-(33) are directed to claim 18 and involve each of GeoCities, ICQ, ICQ 98a and de Hond taken with RFC 822. Claim 18 is reproduced below:

> The method of claim 8 further comprising the step of sending by said interface server computer an e-mail message to an existing e-mail address for said individual member in response to receiving said message entered into said message entry interface, said e-mail message comprising a reply-to address created by said interface.

(2010 PO Amend., 4.) As we have explained in this opinion, we are satisfied that each of GeoCities, ICQ, ICQ 98a, and de Hond either anticipate or render obvious claim 8. As set forth above, claim 18 adds features pertaining to transmission of an e-mail to an e-mail address upon receipt of a message entered into a message entry interface, where the e-mail address includes a "reply-to" address created by the interface. The Requester points to RFC 822 as accounting for those added features. (Req. App. Br., 22-23.)

We have evaluated the above-noted grounds of rejection. The Patent Owner argues that the Requester has not established that the prior art on

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

which it relies shows that a "reply-to address" is created by a server. We do
not agree. (PO Resp. Br., 12.) In our view, the Patent Owner's argument
does not take into account appropriately the level of skill in this art and what
a person of ordinary skill in the art would have understood. In that regard,
the references demonstrate suitably that a server computer is an available
computing component to perform operations associated with a computer,
such as the creation of a "reply-to" address in an e-mail as set forth in RFC
822. One with ordinary skill would have recognized reasonably that the
various server computers disclosed in the art would have been available and
viable components for generating a reply-to address for an e-mail message.

We have fully considered the Patent Owner's arguments, but conclude
that claim 18 would have been obvious based on the prior art applied in each
of grounds (31)-(34). The Examiner decided not to adopt those grounds as
proposed by the Requester. We do not sustain that decision. **Our decision
constitutes a new ground of rejection of claim 18.** *See* 37 C.F.R.
**§ 41.77(b).**

### e. Ground (34) – Robertson and RFC 822

The Requester also proposed that this ground of rejection should have
been made for claim 18. However, as noted above, we do not discern how
Robertson accounts for certain features of claim 1, on which claim 18
depends. The Requester does not attempt to make up for those deficiencies
in conjunction with its proposed ground based on Robertson and RFC 822.

Therefore, we conclude that the proposed rejection of claim 18 based
on Robertson and RFC 822 does not account for all the features required by

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

those claims.  The Examiner's decision not to enter a rejection of claim 18 based on Robertson and RFC 822 is <u>sustained</u>.

### f. Grounds (35)-(37)

Proposed grounds (35)-(37) are directed to claim 19 and involve each of ICQ, ICQ 98a and de Hond taken with RFC 822 and GeoCities.  Claim 19 is reproduced below:

> 19. The method of claim 8 further comprising the step of sending by said interface server computer an e-mail message to an existing e-mail address for said individual member in response to receiving said message entered into said message entry interface, said e-mail message comprising information about a service provided by said interface server computer.

(2010 PO Amend., 4.)  The Patent Owner's challenge to each of the proposed grounds noted above rests on the contention that the Requester has not established that the operations set forth in claim 19 would have been understood by a skilled artisan as being accomplished by a server.  (PO Resp. Br., 13.)  We do not agree.  For reasons similar to those that we have articulated elsewhere in this opinion, we conclude that a person of ordinary skill in the art would have appreciated that the server computers set forth in each of ICQ, ICQ 98a, and de Hond would have been suitable options for performing the step of claim 19.

Accordingly, we <u>do not sustain</u> the Examiner's decision not to enter a rejection of claim 19 based on each of ICQ, ICQ 98a, and de Hond taken with RFC 822 and GeoCities. **Our decision constitutes a new ground of rejection of claim 19.  *See* 37 C.F.R. § 41.77(b).**

### g. Ground (38) - Robertson, RFC 822, and GeoCities

The Requester also proposes this ground of unpatentability for claim 19. As discussed *supra*, however, we conclude that Robertson lacks certain features required by claim 1, on which claim 19 ultimately depends. The Requester, however, does not explain how those features are accounted for in connection with the combination of Robertson, RFC 822, and GeoCities.

Therefore, we <u>sustain</u> the Examiner's decision to enter the Requester's proposed rejection of claim 19 based on a combination of those references.

### h. Grounds (39)-(42)

Proposed grounds (39)-(42) are directed to claim 21 and involve each of ICQ, ICQ 98a and de Hond taken with Coleman. Claim 21 depends from claim 1 and adds the feature "wherein said individual home page further comprises a third control separate from said first and second controls for providing a map indicating a location of said member." (PO 2010 Amend., 5.)

The Requester relies on Coleman to account for the third control feature of claim 21. In particular, the Requester points to disclosure in Coleman relating to graphical maps accessible via a Web page known as "MapQuest" and operable to transmit maps to a user on demand. (Req. App. Br., 26.) The Patent Owner does not dispute that Coleman discloses a control that allows for providing a map to a user as required by claim 21 or that Coleman's teachings may be implemented onto the systems set forth in each of ICQ, ICQ 98a, and de Hond. Rather, the Patent Owner urges that the requirement that the control, as a third control, be separate from the first

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

and second controls is absent from the involved prior art. (PO Resp. Br., 13.)

We are not persuaded that the Patent Owner is correct. In that regard, we are of the opinion that a skilled artisan reasonably would have recognized that in applying Coleman's teachings concerning graphical maps, the tool or control used to access those maps may be distinct or separate from the first and second controls disclosed in each of ICQ, ICQ 98a, and de Hond. Those first and second controls are separately selectable tools which enable different functionality that need not somehow subsume controls that provide other content, such as one dedicated to transmitting map information.

We have considered the Patent Owner's argument but are not persuaded that claim 21 introduces limitations that are distinguished from the teachings of the prior art. We <u>do not sustain</u> the Examiner's decision not to enter rejections of claim 21 based on each of ICQ, ICQ 98a, and de Hond taken with Coleman. **Our decision constitutes a new ground of rejection of claim 21.** *See* **37 C.F.R. § 41.77(b).**

### i. Ground (43) – Robertson and Coleman

As discussed *supra*, claim 1 requires limitations that are not disclosed in Robertson, and claim 19 depends from claim 1. The Requester does not explain how those missing features are suggested in its proposed combination of Robertson and Coleman.

We <u>sustain</u> the Examiner's decision not to enter a rejection of claim 21 based on those references.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

### j. Grounds (44)-(47)

Proposed grounds (44)-(47) are directed to claims 23-25 and involve each of GeoCities, ICQ, ICQ 98a, and de Hond taken with Yahoo!. Claims 23-25 ultimately depend on claim 1 and add features in connection with providing a user interface with a search entry area (claim 23), identifying a plurality of members as possible matches for the search data (claim 24) and providing links to individual home pages for the plurality of members (claim 25).

The Requester contends that the steps of claims 23-25 are disclosed in the prior art. The Patent Owner does not urge that the steps are unknown, but rather bases its challenge on the theory that the prior art does not disclose that an interface server computer performs the steps. (PO Resp. Br., 14-15.)

We have considered the Patent Owner's argument but do not find it persuasive. As expressed throughout this opinion, we conclude that a person of ordinary skill in the art would have understood that the server computers in each of GeoCities, ICQ, ICQ 98a, and de Hond may perform computing functions associated with the operation of Internet based communication systems.

We conclude that Examiner should have adopted the rejections of claims 23-25 proposed by the Requester and involving each of GeoCities, ICQ, ICQ 98a, and de Hond taken with Yahoo!. We <u>do not sustain</u> the Examiner's decision not to enter those rejections. **Our decision constitutes new grounds of rejection of claims 23-25.** *See* 37 C.F.R. § 41.77(b).

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

### k. Grounds (48) and (49)

The Requester proposes that independent claim 26 is unpatentable over Geocities and also over ICQ 98a. Claim 26 is similar to claim 1 but, as noted above, adds an additional restriction in connection with its step of creating an individual home page. Specifically, claim 26 requires that the member's home page is created "without assistance of said member." (2010 PO Amend., 5.)

Although we have concluded that GeoCities and ICQ 98a do not anticipate claim 26 (*see supra*), we do not reach the same conclusion in connection with the obviousness inquiry. It is abundantly clear from the disclosures of GeoCities and ICQ 98a that it is known in the art that a home page may be created for an individual member. The references convey that there are a myriad of functional and aesthetic options available for the design of the home page. While GeoCities and ICQ 98a may themselves generally contemplate that the individual member provides input or assistance in so designing their home page, there is no requirement imposed that the member must in all circumstances provide such input. A person of ordinary skill and creativity in the art readily would have understood that a Web page may be designed on a member's behalf without assistance by the member.

We share the Requester's viewpoint that the limitation set forth in claim 26 concerning a member's home page creation "without assistance" by the member imparts patentability to the claim over the prior art. In our view, the Examiner should have entered grounds of rejection of claim 26 as obvious over each of GeoCities and ICQ 98a. We, therefore, <u>do not sustain</u>

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

the Examiner's decision not enter such rejections. **Our decision constitutes new grounds of rejection of claim 26.** *See* **37 C.F.R. § 41.77(b).**

### l. Ground 50 – Robertson

The Requester also proposed that claim 26 is unpatentable over Robertson. Claim 26 requires the same "allotting" and "associating" steps required by claim 1. As discussed *supra*, we do not discern that Robertson accounts for those steps. The Requester does not explain how those deficiencies in Robertson are cured.

The Examiner did not enter a rejection of claim 26 based on Robertson. The Examiner's decision in that regard is <u>sustained</u>.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

III.   CONCLUSION

A.   PATENT OWNER'S APPEAL

As a result of our assessment of the Patent Owner's Appeal, we reach the following conclusions with respect to the Examiner's decisions to adopt the proposed rejections:

(1)   Claims 1-15 as anticipated by GeoCities:

**Affirmed** as to claims 1, 4-7, 10, 11, and 15;
**Reversed** as to claims 2, 3, 8, 9, and 12-14.

(2)   Claims 1-4, 6-9, and 12-14 as anticipated by ICQ:

**Affirmed** as to claims 1, 4, 6, and 7;
**Reversed** as to claims 2, 3, 8, 9, 12-14, 16, and 22-25.

(3)   Claims 1-5, 7-9, 11, and 13-15 as anticipated by de Hond:

**Affirmed**.

(4)   Claims 1-3, 7-9, and 11 as anticipated by Robertson:

**Reversed**.

(5)   Claims 1, 2, 8, 13, and 14 as anticipated by ICQ 98a:

**Affirmed** as to claim 1;
**Reversed** as to claims 2, 8, 13, and 14.

(6)   Claims 18-25 as anticipated by GeoCities:

**Affirmed** as to claims 20-25;
**Reversed** as to claims 18 and 19.

72

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

(7)     Claims 16, 20 and 22-25 as anticipated by ICQ:

        **Affirmed** as to claim 20;
        **Reversed** as to claims 16 and 2-25.

(8)     Claims 20, 23, and 24 as anticipated by de Hond:

        **Affirmed**.

(9)     Claims 20, 22, and 26 as anticipated by Robertson:

        **Reversed**.

(10)    Claims 1-15 as unpatentable over GeoCities and de Hond:

        **Affirmed**.

(11)    Claims 1-15 as unpatentable over ICQ and de Hond:

        **Affirmed**.

(12)    Claims 1-5, 7-9, 11, and 13-15 as unpatentable over de Hond and Chandra:

        **Affirmed**.

(13)    Claims 1-5, 7-9, 11, and 13-15 as unpatentable over de Hond and Shane:

        **Affirmed**.

(14)    Claims 1-5, 7-9, 11 and 13-15 as unpatentable over Donath and de Hond:

        **Affirmed**.

    (15)   Claims 1-5, 7-9, 11, and 13-15 as unpatentable over
ICQ 98a and de Hond:

**Affirmed**.

    (16)   Claim 17 as unpatentable over ICQ and O'Neal:

**Affirmed**.

    (17)   Claims 16 and 17 as failing to comply with the written
description requirement of 35 U.S.C. § 112, first
paragraph:

**Reversed**.

B.    REQUESTER'S CROSS-APPEAL

With respect to the Requester's Cross-Appeal, we reach the following
conclusions in connection with the Examiner's decisions not to adopt the
proposed grounds of rejection[12]:

    (18)   Claims 5, 10, 11, and 15 as anticipated by ICQ:

**Affirmed** as to claim 10;
**Reversed** as to claims 5, 11, and 15.

    (19)   Claims 4 and 12 as anticipated by ICQ 98a:

**Affirmed** as to claim 12;
**Reversed** as to claim 4.

---

[12]    Any reversal of the Examiner's decision not to enter a proposed
ground of rejection constitutes a new ground of rejection under 37 C.F.R.
§ 41.77(b).

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

    (20)   Claims 4 and 12 as anticipated by Robertson:

                  **Affirmed**.

    (21)   Claim 19 as anticipated by ICQ 98a:

                  **Reversed**.

    (22)   Claim 22 as anticipated by ICQ 98a:

                  **Reversed**.

    (23)   Claims 23-25 as anticipated by ICQ 98a:

                  **Affirmed**.

    (24)   Claim 25 as anticipated by de Hond:

                  **Reversed**.

    (25)   Claim 26 as anticipated by GeoCities:

                  **Affirmed**.

    (26)   Claim 26 as anticipated by ICQ 98a:

                  **Affirmed**.

    (27)   Claim 16 as unpatentable over ICQ and O'Neal:

                  **Reversed**.

    (28)   Claims 16 and 17 as unpatentable over GeoCities and O'Neal:

                  **Reversed**.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

    (29)   Claims 16 and 17 as unpatentable over Robertson and
             O'Neal:

                   **Affirmed**.

    (30)   Claim 18 as unpatentable over GeoCities and RFC 822:

                   **Reversed**.

    (31)   Claim 18 as unpatentable over ICQ  and RFC 822:

                   **Reversed**.

    (32)   Claim 18 as unpatentable over ICQ 98a and RFC 822:

                   **Reversed**.

    (33)   Claim 18 as unpatentable over de Hond and RFC 822:

                   **Reversed**.

    (34)   Claim 18 as unpatentable over Robertson and RFC 822:

                   **Affirmed**.

    (35)   Claim 19 as unpatentable over ICQ, RFC 822, and
             GeoCities:

                   **Reversed**.

    (36)   Claim 19 as unpatentable over ICQ 98a, RFC 822, and
             GeoCities:

                   **Reversed**.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

(37)   Claim 19 as unpatentable over de Hond, RFC 822, and
       GeoCities:

              **Reversed**.

(38)   Claim 19 as unpatentable over Robertson, RFC 822, and
       GeoCities:

              **Affirmed**.

(39)   Claim 21 as unpatentable over GeoCities and Coleman:

              **Reversed**.

(40)   Claim 21 as unpatentable over ICQ and Coleman:

              **Reversed**.

(41)   Claim 21 as unpatenable over ICQ 98a and Coleman:

              **Reversed**.

(42)   Claim 21 as unpatentable over de Hond and Coleman:

              **Reversed**.

(43)   Claim 21 as unpatentable over Robertson and Coleman:

              **Affirmed**.

(44)   Claims 23-25 as unpatentable over GeoCities and
       Yahoo!:

              **Reversed**.

(45)   Claims 23-25 as unpatentable over  ICQ, and Yahoo!:

              **Reversed**.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

(46)   Claims 23-25 as unpatentable over ICQ 98a and Yahoo!:

**Reversed**.

(47)   Claims 23-25 as unpatentable over de Hond and Yahoo!:

**Reversed**.

(48)   Claim 26 as unpatentable over GeoCities:

**Reversed**.

(49)   Claim 26 as unpatentable over ICQ 98a:

**Reversed**.

(50)   Claim 26 as unpatentable over Robertson:

**Affirmed**.

C.   SUMMARY OF CLAIM STATUS

In summary:

1. Claims 1-15 and 20-25 remain rejected; and

2. Claims 4, 5, 11, 15-19, 21, 23-25, and 26 stand rejected on newly adopted grounds.

This opinion contains new grounds of rejection,  In particular, in connection with the Requester's Cross-Appeal, the above-noted reversals of the Examiner's decision not to adopt claim rejections constitute new grounds of rejection pursuant to 37 C.F.R. § 41.77(b).  That section provides that "[a]ny decision which includes a new ground of rejection pursuant to this

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

paragraph shall not be considered final for judicial review."
Correspondingly, no portion of the decision is final for purposes of judicial
review. A requester may also request rehearing under 37 C.F.R. § 41.79, if
appropriate, however, the Board may elect to defer issuing any decision on
such request for rehearing until such time that a final decision on appeal has
been issued by the Board.

For further guidance on new grounds of rejection, see 37 C.F.R.
§ 41.77(b)-(g). The decision may become final after it has returned to the
Board. 37 C.F.R. § 41.77(f).

37 C.F.R. § 41.77(b) also provides that the Patent Owner, WITHIN
ONE MONTH FROM THE DATE OF THE DECISION, must exercise one
of the following two options with respect to the new grounds of rejection to
avoid termination of the appeal as to the rejected claims:

(1) *Reopen prosecution.* The owner may file a response requesting
reopening of prosecution before the examiner. Such a response must be
either an amendment of the claims so rejected or new evidence relating to
the claims so rejected, or both.

(2) *Request rehearing.* The owner may request that the proceeding be
reheard under § 41.79 by the Board upon the same record. ...

Any request to reopen prosecution before the examiner under 37
C.F.R. § 41.77(b)(1) shall be limited in scope to the "claims so rejected."
Accordingly, a request to reopen prosecution is limited to issues raised by
the new ground(s) of rejection entered by the Board. A request to reopen
prosecution that includes issues other than those raised by the new ground(s)

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

is unlikely to be granted. Furthermore, should the patent owner seek to substitute claims, there is a presumption that only one substitute claim would be needed to replace a cancelled claim.

A requester may file comments in reply to a patent owner response. 37 C.F.R. § 41.77(c). Requester comments under 37 C.F.R. § 41.77(c) shall be limited in scope to the issues raised by the Board's opinion reflecting its decision to reject the claims and the patent owner's response under paragraph 37 C.F.R. § 41.77(b)(1). A newly proposed rejection is not permitted as a matter of right. A newly proposed rejection may be appropriate if it is presented to address an amendment and/or new evidence properly submitted by the patent owner, and is presented with a brief explanation as to why the newly proposed rejection is now necessary and why it could not have been presented earlier.

Compliance with the page limits pursuant to 37 C.F.R. § 1.943(b), for all patent owner responses and requester comments, is required.

The Examiner, after the Board's entry of a patent owner response and requester comments, will issue a determination under 37 C.F.R. § 41.77(d) as to whether the Board's rejection is maintained or has been overcome. The proceeding will then be returned to the Board together with any comments and reply submitted by the owner and/or requester under 37 C.F.R. § 41.77(e) for reconsideration and issuance of a new decision by the Board as provided by 37 C.F.R. § 41.77(f).

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

AFFIRMED-IN-PART; REVERSED-IN-PART

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

PATENT OWNER:

TECHCOASTLAW
2032 WHITLEY  AVE
HOLLYWOOD CA, 90058

THIRD-PARTY REQUESTER:

HEIDI KEEFE
COOLEY LLP
3175 HANOVER STREET
PALO ALTO, CA 94304

cu

# ADDENDUM II

Decision on Rehearing

December 27, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

FACEBOOK, INC.
Requester

v.

FRANK M. WEYER and TROY K. JAVAHER
Patent Owners

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122
Technology Center 3900
_____

Before BIBHU R. MOHANTY, KEVIN F. TURNER, and
JOSIAH C. COCKS, *Administrative Patent Judges.*

COCKS, *Administrative Patent Judge.*

DECISION ON REQUEST FOR REHEARING

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

## I.  INTRODUCTION

The owners of U.S. Patent 7,644,122, Frank M. Weyer and Troy K. Javaher (collectively the "Patent Owner"), request rehearing under 37 C.F.R. § 41.79 of the Board's Decision mailed June 5, 2013 ("Decision").[1]  Third-Party Requester, Facebook, Inc. ("Requester"), contends that the Patent Owner's rehearing request should be denied.[2]

For the following reasons, the Patent Owner's request for rehearing is *denied*.

## II.  DISCUSSION

A "request for rehearing must state with particularity the points believed to have been misapprehended or overlooked" by the Board in rendering its Decision.  37 C.F.R. § 41.79(b)(1).  Here, however, the Patent Owner does not contend that the Board misapprehended or overlooked any point in connection with the Decision.  Instead, the Patent Owner offers the following as the basis for its rehearing request:

> The claim construction adopted by the Board is broader tha[n] that used by the Examiner as the basis for the Examiner's rejections as set forth by the Examiner in the ACP and confirmed by the Examiner in the RAN.  As such, the Patent Owner has not heretofore had an opportunity to amend the claims in response to the claim construction set forth in the Decision.  The Patent Owner therefore respectfully requests that the Board designate its affirmance of the Examiner's rejections of independent claim 1 and dependent claims 2-15 and 20-25,

---

[1] *See* "Request for Rehearing Pursuant to 37 CFR 41.79" filed June 19, 2013 ("Reh'g Req.")

[2] *See* Requester's "Comments" submission filed July 19, 2013.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

> which are based on the new claim construction set forth by the
> Board in the Decision, as new grounds of rejection pursuant to
> 37 CFR 41.77.

Reh'q Req., p. 1.

At issue in construing the claims was whether the phrase "by an interface server computer" appearing in the preamble of claim 1 mandated that all steps of the claimed method must be performed by an interface server computer. In the Decision, we agreed with the Requester that, under the guise of broadest reasonable interpretation, the general reference in the preamble of claim 1 of "by an interface server computer" does not require that each and every step recited in the method need be performed by such a computer. Decision, pp. 11-14.

At the outset, it is not evident that the Examiner's rejections were premised necessarily on an interpretation of the preamble of claim 1 as requiring that all steps of the claimed method must be performed by an interface server computer. It is clear from the record that the claim scope advocated by the Patent Owner in connection with the "by said interface server computer" recitation of the preamble was a source of dispute between the Patent Owner and the Requester throughout the proceeding, with the Requester commenting that claim 1 does not require that all recited steps must be performed by the computer. The Examiner, in adopting the rejections proposed by the Requester, expressed agreement with the comments articulated by the Requester.[3]

---

[3] *See, e.g.*, Action Closing Prosecution (mailed April 15, 2011), p. 54, and Right of Appeal Notice (mailed August 19, 2011), p. 55.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

In any event, "the ultimate criterion of whether a rejection is considered 'new' in a decision by the board is whether appellants have had fair opportunity to react to the thrust of the rejection." *In re Kronig*, 539 F.2d 1300, 1302 (CCPA 1976). Even assuming that the Examiner construed claim 1 of the '122 patent more narrowly than did the Board in the Decision, our affirmance of the Examiner's rejection based on a broader interpretation of the limiting effect of the claim preamble did not alter the thrust of rejection. Indeed, in so affirming the rejection, our construction was not based on any underlying facts that were additional to, or different from, those on which the Examiner relied. In that regard, even if our interpretation of claim 1 may be broader in some respect, our affirmance of the rejection did not draw from the teachings of the prior art any more content than that which was relied on by the Examiner.

Furthermore, contrary to the Patent Owner's assertions, the Patent Owner had ample opportunity during the course of this reexamination proceeding to revise the claims by way of amendment. As noted above, the dispute between the Patent Owner and the Requester in connection with the "by said interface server computer" recitation was evident throughout the course of the proceeding. The Patent Owner's decision to stand on its interpretation of claim 1's preamble in connection with the corresponding claim scope urged was not due to a lack of opportunity to amend the claims.

Accordingly, for the foregoing reasons, we decline to modify our Decision.

Appeal 2012-010411
Reexamination Control 95/001,411
Patent 7,644,122

### III.  ORDER

The Patent Owner's Request for Rehearing has been considered, but the relief requested therein is *denied*.

<u>DENIED</u>

PATENT OWNER:

TECHCOASTLAW
2032 Whitley Avenue
Hollywood, CA  90058

THIRD PARTY REQUESTER:

HEIDI KEEFE, COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304

# ADDENDUM III

U.S. Patent No. 7,644,122

US007644122B2

(12) **United States Patent**
Weyer et al.

(10) Patent No.: **US 7,644,122 B2**
(45) **Date of Patent:** **Jan. 5, 2010**

(54) **METHOD APPARATUS AND BUSINESS SYSTEM FOR ONLINE COMMUNICATIONS WITH ONLINE AND OFFLINE RECIPIENTS**

(76) Inventors: **Frank Michael Weyer**, 264 S. La Cienega Blvd., Suite 1224, Beverly Hills, CA (US) 90211; **Troy Kurosh Javaher**, 264 S. La Cienega Blvd., Suite 1224, Beverly Hills, CA (US) 90211

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/623,132**

(22) Filed: **Jan. 15, 2007**

(65) **Prior Publication Data**

US 2007/0250584 A1      Oct. 25, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 10/747,881, filed on Dec. 29, 2003, now abandoned, which is a continuation of application No. 09/447,755, filed on Nov. 23, 1999, now Pat. No. 6,671,714.

(51) **Int. Cl.**
    *G06F 15/16*      (2006.01)
(52) **U.S. Cl.** ...................... **709/203**; 709/206; 709/218; 709/219
(58) **Field of Classification Search** ................ 709/203, 709/217–219, 206
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,659,732 A * | 8/1997 | Kirsch ............................ | 707/5 |
| 6,471,521 B1 * | 10/2002 | Dornbush et al. ........... | 434/322 |
| 7,065,494 B1 * | 6/2006 | Evans .......................... | 705/10 |

* cited by examiner

*Primary Examiner*—Shawki S Ismail
(74) *Attorney, Agent, or Firm*—Techcoastlaw; Frank Michael Weyer

(57) **ABSTRACT**

The present invention comprises a method, apparatus and business system for allowing on-line communications with members of a group of recipients for whom the invention has been implemented. A group may, for example, comprise members of a particular business or profession. For example, a group may consist of doctors admitted to practice medicine in the United States. Individual members of the group may or may not have existing internet presences. The invention allows online users to communicate with each member of a given group regardless of whether or not the member has an existing internet presence. In one or more embodiments, the invention does so by setting up a database of contact information for members of the group, creating an internet presence for each member of such group, creating an on-line user interface allowing a user to access the member's created internet presence, and providing means of communications between the created internet presence and the member recipient.

**15 Claims, 10 Drawing Sheets**





## Figure 1

200
210
EVERYMD.COM
205
Please enter your name and contact information:
First
MI
Last
Address1
Address2
City
State
Zip
Phone
E-Mail
Please enter the name, city, and state, and street (if known) of the doctor you would like to contact
First
MI
Last
City
State
Street (if known)
Visit Website
230
Please enter any message you would like to send below:
(a copy of your message will be sent to your e-mail address as indicated above)
215
220
Clear
225
Send

Figure 2

200
210
EVERYMD.COM
205
Please enter your name and
contact information:
First Jane MI M Last Doe
Address1 1234 First St.
Address2
City Anytown State CA Zip 12345
Phone (222) 111-2345
E-Mail jdoe2@techcoastcorp.com
Please enter the name, city,
and state, and street (if known)
of the doctor you would like to contact
First John MI S Last Smith
City Big City State CA
Street (if known) Main St.
Visit Website
230
Please enter any message you would like to send below:
(a copy of your message will be sent to your e-mail address as indicated above)
Dear Dr. Smith,
My ankle is still very painful. Would you be able
to see me any time this Thursday or Friday?
Afternoons would be best for me.
Thank you.
Jane Doe
215
220
Clear
225
Send

Figure 3



200
210
EVERYMD.COM
205
Please enter your name and contact information:
First Jane MI M Last Doe
Address1 1234 First St.
Address2
City Anytown
Phone (222) 111
E-Mail jdoe2@te
Please enter the name, city, and state, and street (if known) of the doctor you would like to contact
First John MI S Last Smith
City Big City State CA
in St.
Visit Website
230
More than one doctor fits the criteria you specified. Please pick the correct doctor from the list below:
405
Select
Dr. John S. Smith, M.D. Obstetrics
Select
Dr. John S. Smith, Jr., M.D. Orthopedics
410
415
Not Listed
Pl
(a copy of you
below:
s indicated above)
215
Thank you.
Jane Doe
400
220
Clear
225
Send

Figure 4



500 Sender accesses IS website
505 IS provides user interface
506 Sender enters sender info
507 Sender enters recipient info
509 Sender selects desired action
511 IS queries contact data base
515 IS displays list of possible matches
516 Intended recipient listed?
Yes
No
518 Sender indi-cates recipient not listed
519 IS diplays acknowledge/ follow-up msg.
517 Sender selects recipient from list
520 IS retrieves recipient contact info
525 Sender's desired action?
Visit website
Send e-mail
530 Send sender to recipient website
535 Send recipient e-mail informing of sender visit
540 Active e-mail address?
Yes
No
560 Deliver e-mail message
565 Inform sender that e-mail msg sent
545 Fax Number?
Yes
No
547 Send e-mail message as fax
548 Send copy of e-mail to inact. e-mail address
549 Inform sender e-mail msg sent as fax
550 Convert text message to voice msg
554 Deliver voice msg to recipient telephone no.
556 Send copy of e-mail to inact. e-mail address
558 Inform sender e-mail msg sent as voice

Figure 5

Figure 6



Figure 7



Case: 14-1378 CASE PARTICIPANTS ONLY Document 14 Page 142 Filed 05/23/2014

Figure 8A

Figure 8B





Figure 9

900
DRJSMITH.EVERYMD.COM
905
910
Dr. John S. Smith
2356 Main Street
Big City, CA 99921
Tel: 333/234-5566
E-mail: drjsmith@everymd.com
Rating: Not yet rated
915
View map
920
Send E-mail
925
Post Comment
Field of Practice: Orthopedics
Education: Harvard Medical School. MD 1987
Yale, BS Biology 1979
Member:
935
More
California Medical Association
American Medical Association
American College of Orthopedic Surgeons
930
Return to EVERYMD.COM Homepage





Figure 10

US 7,644,122 B2

**1**

## METHOD APPARATUS AND BUSINESS SYSTEM FOR ONLINE COMMUNICATIONS WITH ONLINE AND OFFLINE RECIPIENTS

### CROSS-REFERENCE TO RELATED APPLICATIONS

This patent application is a continuation of pending U.S. patent application Ser. No. 10/747,881 entitled "Method, apparatus and business system for online communications with online and offline recipients," filed Dec. 29, 2003, now abandoned which is a continuation of U.S. patent application Ser. No. 09/447,755 entitled "Method, apparatus and business system for online communications with online and offline recipients," filed Nov. 23, 1999, issued Dec. 30, 2003 as U.S. Pat. No. 6,671,714.

### FIELD OF THE INVENTION

The present invention relates to the field of online communications, and more particularly to a method, apparatus, and business system for online communications with diverse online and offline recipients.

### BACKGROUND OF THE INVENTION

The internet is rapidly becoming a preferred means of communication for professionals, businesses and consumers. Communications conducted via the internet include sending and receiving e-mail messages and disseminating information via web sites. But even for the most "wired" businesses and professions, internet usage is less than 100%. Accordingly, heretofore there has always existed a degree of uncertainty as to whether an internet user who wishes to communicate with a given business or professional (such as, for example, a doctor or a dentist) via the internet will be able to do so because the intended recipient may or may not have an existing internet presence that can receive the user's online communication.

Even if the intended recipient has an appropriate internet presence, a second element of uncertainty exists with respect to locating the proper e-mail address or website URL for the intended recipient. Although a number of online search and directory services exist that are intended to help a user locate the website or e-mail address of a business or person with which the user desires to communicate, use of such directories is tedious and often unsuccessful.

The present invention overcomes the limitations of the prior art by providing a method, apparatus and business system that allow a user to quickly communicate online with a member of a particular business, professional or other group regardless of whether the member has an internet presence (e.g. e-mail address or website) and without the user needing to know or find the internet address for the recipient.

### SUMMARY OF THE INVENTION

The present invention comprises a method, apparatus and business system for allowing on-line communications with members of a group of recipients for whom the invention has been implemented. A group may, for example, comprise members of a particular business or profession. For example, a group may consist of doctors admitted to practice in the United States. Individual members of the group may or may not have existing internet presences (as used herein, the term "internet presence" refers to an internet e-mail address and/or website, or other means for receiving or sending communi-

**2**

cations via the internet). The invention allows online users to communicate with each member of a given group regardless of whether or not the member has an existing internet presence. In one or more embodiments, the invention does so by setting up a database of contact information for members of the group, creating an internet presence for each member of such group, creating an on-line user interface allowing a user to access the member's created internet presence, and providing means of communications between the created internet presence and the member recipient. The invention allows a user to communicate with an intended recipient who is a member of a group for which an embodiment of the invention has been implemented using the created internet presence, regardless of whether or not the recipient has a pre-existing internet presence. In one or more embodiments, if the recipient has a pre-existing internet presence, online communications from a user are transparently forwarded from the created internet presence to the recipient's existing internet presence. In one or more embodiments, a "reply to" address is created for a sender/user and added to e-mail messages sent by the user so that any reply message from the recipient will be returned to the sender via the sender's created address. In one or more embodiments, when a sender's e-mail message is replied to by the recipient, the reply message's "reply-to" address is replaced with a created e-mail address for the recipient, so that the reply appears to have been sent from the recipient's created e-mail address even if it has been sent from a different e-mail address. In one or more embodiments, if an intended recipient has no pre-existing internet presence, online communications from a user are converted into one or more forms of offline communications, according to information contained in the contact database. For example, in one or more embodiments, e-mail messages from a user sent via the created internet presence of an offline recipient are converted to fax messages, voice-mail messages, or other off-line forms of communications (as used herein, the term "online" refers to communications via the internet, whereas the term "offline" refers to non-internet communications), as appropriate. In one or more embodiments, means are provided for receiving reply messages from an offline recipient via offline means, converting such messages to online messages, and delivering them to the original user with the appearance of having originated from the created internet presence of the original recipient. The present invention is a method and system for online selection of contestants for online or offline competitions that uses objective selection criteria and allows the participation by members of the general public. It also provides an effective marketing and revenue generating mechanism as part of the contestant section process.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic diagram illustrating functional components of an embodiment of the invention.

FIG. **2** shows an example of a user interface that may be used with one or more embodiments of the invention.

FIG. **3** shows the user interface of FIG. **2** with information that has been entered by a user.

FIG. **4** shows the user interface of FIG. **3** after a dialog box has appeared.

FIG. **5** is a flow chart showing method steps used in an embodiment of the invention.

FIG. **6** is a flow chart showing method steps used in an embodiment of the invention.

FIG. **7** is a flow chart showing method steps used in an embodiment of the invention.

US 7,644,122 B2

## 3

FIGS. **8**A and **8**B are flow charts showing method steps used in an embodiment of the invention.

FIG. **9** shows an example of a member webpage that may be used with one or more embodiments of the invention.

FIG. **10** is a block diagram of a computer system that may be used with one or more embodiments of the invention.

### DETAILED DESCRIPTION OF THE INVENTION

The present invention comprises a method, apparatus and business system for conducting online communications with online and offline recipients. In the following description, numerous specific details are set forth to provide a thorough description of the invention. However, it will be apparent to one skilled in the art that the invention may be practiced without these specific details. In other instances, well-known features have not been described in detail so as not to obscure the invention.

The present invention allows a user (also sometimes referred herein as a "sender") to communicate via the internet with a recipient who is a member of a group for which the invention has been implemented. For example, the group may be all doctors admitted to the practice of medicine in the United States, and the user may be a patient who would like to communicate via e-mail with his or her doctor. The patient does not need to know the e-mail address or website URL of the intended recipient, and the intended recipient may or may not have an existing e-mail address and/or website URL.

In the following discussion, the invention will at times be described with respect to a patient wishing to communicate with a doctor. However, it will be apparent to those skilled in the art that the invention is not limited to patients communicating with doctors, but may be used for facilitating online communications with members of any group for which the invention has been implemented.

FIG. **1** is a schematic diagram showing components used in an embodiment of the invention. In the embodiment of FIG. **1**, a user who wants to communicate with a recipient uses the user's computer **100** and an internet connection **105** to communicate with an interface server computer **110**. In one or more embodiments, the user utilizes a web browser such as Netscape Navigator or Microsoft Internet Explorer running in user computer **100** to access a website hosted by interface server **110** (interface server **110** may be implemented as a dedicated server computer, a virtual server hosted by an internet service provider ("ISP"), as a system of multiple interconnected computers, or may be implemented in any other appropriate manner). Interface server **110** provides an interface to user computer **100** (for example in the form of one or more web pages) that allows the user to select the intended recipient and specify the form of communication the user would like to use (e.g. sending an e-mail message or visiting the recipient's website).

Interface server **110** is connected to a contact data base **115** that contains contact information for one or more groups of recipients. Data base **115** may be directly connected to interface server **110**, or may be connected to interface server **110** by the internet or by any other network or other telecommunications means. Data base **115** may comprise a data base server system, data base files accessible by a data base manager program, or any other form of data base system that can store and retrieve contact information. In one or more embodiments, contact data base **115** comprises a plurality of data sources that can be searched by interface server **110** for contact information. For example, contact data base **115** may comprise one or more online directory servers, such as, for example, www.411.com or www.switchboard.com, that can

## 4

be searched by interface server **110**. Furthermore, contact data base **115** need not comprise a separate system but may be integrated into interface server **110**.

In addition to user computer **100**, interface server **110** and contact data base **115**, the embodiment of FIG. **1** also includes various means by which a recipient may receive communications from a user (the terms "user" and "sender" are used interchangeably herein). In the embodiment of FIG. **1**, these means include a recipient computer or other internet access device **125**, a recipient fax machine **135**, and a recipient telephone **140**. Internet access device **125** may be used when a recipient has an appropriate existing online presence. Fax machine **135** and telephone **140** may be used when a recipient does not have an appropriate existing online presence. It will be noted that these recipient communications devices are examples only and any other kind of communications devices may also be used. An "appropriate existing online presence" is an existing e-mail address or website known and accessible to the interface server **110**. The embodiment of FIG. **1** also includes communications means such as an internet connection **120** and a telecommunications connection **130** by which interface server **110** can send communications to the recipients' communications devices **125**, **135** and **140**.

FIG. **5** is a flow chart showing method steps used for sending a communication from a user/sender to a recipient using an embodiment of the invention. As shown in FIG. **5**, the process starts when a sender wishing to communicate with a member of a group for which the invention has been implemented accesses the interface server's web site at step **500**. The sender may access the interface server's web site, for example, by using the sender's computer, internet connection and browser software and specifying the interface server's URL. For example, in one embodiment of the invention in which the group for which the invention has been implemented is doctors licensed to practice medicine in the United States, the sender may access the interface server's website by specifying the URL "www.everymd.com." In the discussion below, the interface server's URL is sometimes referred to as "www.interfaceserver.com". However, any other URL may be used. It will be noted that the sender may abort the process of FIG. **5** at any time by going to a different URL, exiting the user's browser software, or otherwise terminating the sender's connection with the interface server.

Upon receiving a request from the sender to access the interface server's website, the interface server provides a user interface to the sender at step **505**. The interface may, for example, be provided in the form of a webpage that utilizes hypertext markup language (HTML).

After receiving the user interface (for example in the form of HTML code) from the interface server, the sender enters information into appropriate fields as indicated in the user interface. For example, in the embodiment of FIG. **5**, the sender enters identifying information for the sender at step **506** and identifying information for the recipient at step **507**. For example, the sender may enter the sender's name, telephone number, and e-mail address at step **506** and the last name, city and state of the desired recipient at step **507**. If known, the sender may also provide additional information, such as the recipient's street address or street name. In one or more embodiments, if the sender has previously visited the interface server's website, some or all of the sender's previously entered sender and recipient identifying information may be retrieved using "cookies" previously set by the interface server.

After entering the recipient identifying information at step **507**, the sender selects the desired action from choices provided by the user interface at step **509**. In one or more embodi-

US 7,644,122 B2

5

ments, the choices provided by the user interface include visiting the recipient's website (for example to obtain additional information about the recipient) and sending the recipient an e-mail message. If the sender's desired action is to send an e-mail message, the selection step **509** includes the sender entering the desired e-mail message.

FIG. **2** shows an example of a user interface **200** that may be used in one or more embodiments of the invention. The user interface of FIG. **2** is for an embodiment of the invention that has been implemented for a group that comprises doctors admitted to practice medicine in the United States. In this example, the URL of the interface server is "EVERYMD. COM." In the embodiment of FIG. **2**, user interface **200** includes a sender information entry area **210**, a recipient information entry area **205**, an e-mail message text entry area **215**, and control buttons **220**, **225**, and **230**. To use interface **200** of FIG. **2**, a user enters the user's name, address, phone number and e-mail address in the appropriate text fields in sender information area **210**. The sender also enters the name, city, state, and street location, if known, of the intended recipient (who, in the example of FIG. **2**, is a doctor) in the appropriate fields of recipient information area **205**. If the user wants to send an e-mail message to the recipient, the user may also enter e-mail message text into e-mail message text entry area **215**. The user may clear any text entered into text entry area **215** by clicking on "Clear" control button **220**.

FIG. **3** shows an example of user interface **200** after information has been entered by a user into entry areas **210**, **205** and **215**. After the information is entered by the sender, the sender may select the sender's desired action. The user may click on "Visit Website" control button **230** to visit the recipient's website, or on "Send" control button **225** to send the e-mail message entered in e-mail message entry area **215** to the recipient.

Returning to FIG. **5**, at step **511**, the interface server queries the contact data base using the recipient identifying information provided by the user to determine whether the intended recipient is found in the contact data base. In one or more embodiments, the data base will return exact matches and close matches. In one or more embodiments, the data base will always return at least one close match.

At step **515**, the interface server provides a list of the possible recipients retrieved from the data base to the user. An example of such a list is shown in FIG. **4** as pop-up box **400**. At step **516**, the user examines the list and determines whether or not the desired recipient is listed. If the intended recipient is not listed, the sender indicates that the recipient is not listed at step **518** (for example by clicking on "Not Listed" button **415** of FIG. **4**), and the interface server displays a message to the sender acknowledging that the recipient was not found. In one or more embodiments, the interface server may display a message requesting additional information about the intended recipient and offering to attempt to locate the intended recipient within 24 hours or some other period of time.

If the intended recipient is on the list, the sender selects the intended recipient (for example by moving a cursor over the name of the intended recipient and clicking a button on a cursor control device such as a mouse, or by clicking on one of selection buttons **405** and **410** of FIG. **4**) at step **517**. At step **520** the interface server retrieves contact information for the selected recipient from the contact data base. For example, the contact information may include an indication of whether or not the recipient has an existing website or e-mail address, and, if so, identify the URL of the existing website or the existing e-mail address. The contact information data base may also include additional information, such as a count of

6

the number of times that a particular recipient has been contacted via the facilities provided by the interface server, whether the recipient has replied, whether the recipient has indicated a preferred mode to be contacted, etc.

In the embodiment of FIG. **5**, after step **520**, a determination is made at step **525** as to whether the sender's desired action is to send an e-mail message or to visit the recipient's website.

If the action selected by the sender is to visit the recipient's webpage, the method continues at step **530**. At step **530**, the sender's browser is linked to the recipient's website and the recipient's home page displayed on the sender's browser, as is well known in the art. The recipient's website may be an existing website of the recipient, or may be a website that has been created for the recipient, for example using the method described below with respect to FIG. **6**. In one or more embodiments of the invention, if the website that is displayed is a pre-existing website (as opposed to a created website) the recipients website is displayed in a frame, with another frame containing navigational controls allowing the sender to easily return to the interface server's website. At step **535**, the interface server sends the recipient an e-mail informing the recipient that a sender has visited the recipient's website. The e-mail may be sent, for example, using the methods for sending e-mail of the invention. Where the recipient's website that has been visited is a created website, the e-mail may also contain instructions informing the recipient of how the recipient may access, and/or edit, and/or otherwise modify or provide additional information for the recipient's created website. The e-mail message in one or more embodiments may also contain information describing services provided by the interface server.

If the sender's action selected at step **509** is to send an e-mail message, after step **525**, the embodiment of FIG. **5** continues from step **525** to step **540**. At step **540**, the interface server inspects the contact data for the intended recipient received at step **520** to determine whether the recipient has an active e-mail address. An "active" e-mail address is an address that is known to have been actually used by the recipient. An "active" e-mail address is distinguished herein from an e-mail address that has been created by for the recipient but that has not yet been accessed by the recipient. As described in greater detail below, in one or more embodiments of the invention, an e-mail box is created for each member of the group for which the invention is being implemented. If the member is known to be using a different e-mail address, the created e-mail box may be linked to the existing e-mail box such that e-mail messages sent to the created e-mail box are automatically forwarded to the existing e-mail box. An e-mail box is considered to be inactive if it has been created for a recipient, but has not yet been accessed by the recipient.

If it is determined at step **540** that the recipient has an active e-mail address, the sender's e-mail message is delivered to that e-mail box at step **560**, and a message informing the sender that the e-mail message has been delivered to the recipient is delivered at step **565**. The message delivered to the sender may include a statement that although the sender's message has been delivered to the recipient's e-mail address, there is no guarantee that the recipient will actually read the message.

FIGS. **8**A and **8**B are block diagrams, respectively, of processes used in one or more embodiments of the invention to deliver an e-mail message from a sender to a recipient who has an existing e-mail address, and for delivering a reply from the recipient to the sender.

US 7,644,122 B2

7

The process of FIG. **8**A may be used, for example, at step **560** of the embodiment of FIG. **5**. The process starts after the sender has composed an e-mail message and has selected the desired recipient. The process may also be used, for example, with e-mail messages that have been sent to a mailbox that has been created for a recipient using normal e-mail channels (as opposed to a message that has been created and sent using the user interface provided by the interface server of the invention).

At step **800**, an e-mail address using the naming convention of the interface server is created for the sender. For example, if the sender's name is "Joe Smith" and the interface server's domain name is "interfaceserver.com", the address "jsmith@interfaceserver.com" may be created for the sender. More generally, e-mail addresses created for the sender may be of the form "[sendername]@interfaceserver.com".

As is well known to those skilled in the art, e-mail messages may include information about the sender, including the sender's "reply to" and/or "from" e-mail address. The inclusion of the sender's "reply to" e-mail address allows the recipient to easily "reply to" the sender's e-mail message by entering a "reply" command typically provided by e-mail client programs.

In the embodiment of FIG. **8**A, at step **805**, the sender's existing e-mail address (obtained, for example, from a field in the user interface provided by the interface server, or from "reply to" information extracted from the sender's original e-mail message) and the sender's created address (that was created at step **800**) are stored in a contact information database (which may or may not be the same as the contact data base that contains recipient contact information, such as contact data base **115** of FIG. **1**). At step **810**, the created e-mail address for the sender is added to the sender's e-mail message as the "reply to" address for the e-mail message. If the e-mail message includes a pre-existing "reply to" address for the sender, the existing address is replaced with the created address. For example, if the sender is sending a message from "jsmith123@aol.com"                to "drjamesjones@interfaceserver.com", the interface server will replace the sender's original "jsmith123@aol.com" "reply to" e-mail address with the created address, "jsmith@interfaceserver.com". When the recipient replies to the message by using a "reply to" command, the reply message will then be sent to "jsmith@interfaceserver.com" instead of directly to "jsmith123@aol.com". That way, messages between sender and recipient all pass through the interface server, allowing the interface server to modify the "reply to" e-mail addresses of each communication between a sender and recipient such that all messages appear to have come from an e-mail account at the interface server. That helps the interface server build its brand identity and helps promote repeat visits to the interface server's website.

After the created e-mail address has been added as the "reply to" address to the sender's e-mail message at step **810**, the e-mail is forwarded to the recipient's existing (active) e-mail address at step **815**.

FIG. **8**B shows a corresponding process that may be used in one of more embodiments for forwarding a reply message from the original recipient to the original sender. The process may also be used for forwarding any other e-mail messages received at the sender's created e-mail address.

The process starts at step **850** when a message is received by the interface server addressed to the e-mail address that has been created by the interface server for the sender (e.g. "[sendername]@interfaceserver.com"). After the e-mail message is received, the source (sender) of the message is identified at step **855** from sender and "reply to" information

8

contained in the e-mail message. At step **860** a determination is made as to whether the source of the message is a member of the group for which the invention has been implemented, or is otherwise someone for whom an e-mail address has been created at the interface server. Such a determination may be made, for example, by comparing the source information identified at step **855** with information contained in the interface server's contact data base.

If it is determined at step **860** that the source of the e-mail message is someone for whom an e-mail address has been created at the interface server, then at step **865** any "from" and "reply to" information in the e-mail message that specifies a source e-mail address other than the created e-mail address is replaced with the created e-mail address at step **865**. For example,        assume        that        the        e-mail        address "drjbrown@internetserver.com" has been created at the interface server for a Dr. John Brown. Assume further that Dr. John Brown        already        has        a        pre-existing        address, "jbrown451@aol.com", and used that e-mail address to send the e-mail message, and that "Jbrown451@aol.com" is specified as the "from" and "reply to" addresses in the received e-mail. According to step **865**, all references to "Jbrown451@aol.com" in the e-mail message are replaced with        the        created        e-mail        address "drjbrown@internetserver.com". Thereafter, the message is forwarded to the sender's existing e-mail address at step **870**.

If it is determined at step **860** that the source of the reply message is not a member of the group, the message is forwarded to the recipient at step **870** without any changes being made to the "from" and "reply to" e-mail addresses listed in the e-mail.

Returning to FIG. **5**, if it is determined at step **540** that the recipient does not have an active e-mail address, a determination is made at step **545** (again using the information retrieved from the contact data base) as to whether a fax number is known for the recipient. If a fax number is known, the sender's e-mail message is converted to a fax message and is transmitted to the recipients fax machine at step **545**. In the embodiment of FIG. **5**, a copy of the e-mail message is also sent to the e-mail box that has been created for the recipient at step **548**, even though the created e-mail box may not be active (i.e. the e-mail box has not yet been accessed by the recipient). In one or more embodiments, in addition to containing the sender's e-mail message, the fax sent to the recipient at step **547** may include information describing the services provided by the interface server and/or instructions informing the recipient how the recipient may access the recipient's created e-mail box and/or created website. The fax may also provide instructions to the recipient for responding to the fax message. For example, in one or more embodiments, the fax message may specify fax and voice telephone numbers that the recipient can use to send a reply message. In one or more embodiments, voice and/or voice reply messages received at the specified numbers are converted to e-mail messages and forwarded to the original sender's existing e-mail address. In one or more embodiments, the recipient's created e-mail address is inserted as the "reply to" address of any such converted e-mail message.

After the e-mail message has been sent to the recipient via fax at step **547**, an e-mail message is sent to the sender at step **549** informing the sender that the sender's e-mail message has been delivered to the recipient via fax.

If no fax number for the recipient is found in the contact information obtained from the contact data base at step **545**, the e-mail message is converted to a voice message at step **550** and delivered as a voice message to the recipient's telephone number at step **554**. The process for delivering such a voice

US 7,644,122 B2

9

message in one or more embodiments is illustrated in FIG. 7 and described below. A copy of the e-mail message is delivered to the recipient's created e-mail box at step 556, and an e-mail message is sent to the sender at step 558 informing the sender that the e-mail message has been delivered to the recipient's telephone as a voice mail message. In one or more embodiments, the message sent to the sender at step 558 may include a statement recommending the sender to follow up with a direct telephone call to the recipient's telephone number if the sender does not receive a response to the sender's message within a certain period of time.

FIG. 7 is a block diagram showing steps of an automated process to deliver a sender's e-mail message to the recipient as a voice message that may be used in one or more embodiments of the invention. The method of FIG. 7 may be used, for example, at steps 550 and 554 of the embodiment of FIG. 5.

In the embodiment of FIG. 7, the text of the sender's e-mail message is converted to a voice message at step 700 using text-to-speech conversion techniques that are well known in the art. At step 705, the recipient's telephone number is dialed, and a response is awaited at step 710. In one or more embodiments, a response may consist of a busy signal, an indication that the telephone has been answered, or some other indication of the occurrence of an action at the recipient's end of the telephone line.

At step 715, a determination is made as to whether the response received at step 710 comprises an indication that the recipient's telephone has been answered. If the recipient's telephone has not been answered, the process proceeds to step 716, where a determination is made as to whether a specified redial limit has been exceeded. For example, a redial limit of 10 redial attempts may be used in one or more embodiments of the invention. If the redial limit has been exceeded, an e-mail message is sent to the sender at step 717 informing the sender that the sender's e-mail message could not be delivered at the present time. In one or more embodiments, the e-mail message sent to the sender may include a statement that renewed attempts to deliver the e-mail message will be made at a subsequent time, for example during normal business hours if the e-mail message was originally sent by the sender outside of normal business hours.

If at step 715 it is determined that the redial limit has not yet been exceeded, the process awaits the expiration of a redial period at step 720 before redialing the recipient's telephone number at step 705.

If it is determined at step 715 that the recipient's telephone has been answered, a determination is made at step 725 as to whether audio is being transmitted from the recipient's telephone. Such audio may consist of, for example, of words spoken by a person answering the telephone (e.g. "Dr. Rosen's Office, how may I help you?"), or an audio message delivered by a voice mail system or telephone answering machine.

If it is determined that audio is being transmitted at step 725, the end of the audio transmission (e.g. the telephone answering machine or person finishing the initial voice greeting) is awaited at step 730. Once the audio is completed, the process continues to step 735. If it is determined at step 725 that no audio is being transmitted at step 725, the process proceeds directly from step 725 to step 735.

At step 735, a voice message relating instructions to the recipient is transmitted to the recipient's telephone. For example, in one or more embodiments, the instructions may consist of a statement indicating that a voice message is being delivered to the recipient and prompting the recipient to press one or more buttons on the recipient's telephone (e.g. "Please press *12 if you would like to receive the voice message").

10

The message may also include instructions informing the recipient how the recipient may retrieve the voice mail message by calling a specified telephone number and keying in specified digits (in case the recipient's telephone is being answered by a voice mail system or answering machine) and/or instructions on how the recipient may reply to the message via telephone, fax, or other means.

At step 740, a determination is made as to whether the message retrieve code specified in the instructions played at step 735 has been transmitted by the recipient within a prescribed time period. If the time period expires without receiving the message retrieve code, the process continues to step 716. If the retrieve code is received at step 740, the voice mail message is delivered at step 745.

FIG. 6 is a block diagram showing process steps for setting up a contact data base according to one or more embodiments of the invention. As shown in FIG. 6, the members of the group for which the invention is being implemented and the contact data base is being created are defined at step 600. For example, the members in one embodiment are defined as doctors admitted to practice medicine in the United States. At step 605, the type of contact information desired for the group is identified. For example, in one or more embodiments, the desired contact information for a member includes telephone number, fax number, e-mail address, and website URL.

At step 610, sources of publicly available information for members of the group for which the contact data base is being created are identified. In addition to publicly available information, other sources of information may also be used. For example, if the group for which the invention is being implemented is doctors admitted to practice in the United States, sources of information used may include state boards of health and/or other government and/or non-government agencies that maintain records about medical practitioners.

At step 615, a first member of the group is selected. At step 620, the sources of contact information identified at step 610 are queried for information about the selected member. At step 625 a determination is made as to whether the desired contact information was found. If more than one type of information is being sought, this determination is made, and the succeeding steps are performed, for each type of contact information being sought.

If it is determined at step 625 that the desired contact information has been found, that information is entered into the contact database at step 630. In one or more embodiments, the contact information that has been found may be designated as "existing" contact information. Thereafter, even though the desired contact information has been found, a new "point of contact" (as defined below), is created for the member at step 635. A new point of contact is also created for the member if it is determined at step 625 that the desired contact information is not found at step 625.

As used herein, a "point of contact" means a real or virtual location or mechanism that is set up for a member of a group for which the invention is implemented to allow the member to receive contacts of the type for which contact information is being sought. For example, if the type of contact information that is being sought is an e-mail address, the point of contact may comprise an e-mail account (e.g. a POP mailbox) set up for the member. Similarly, if the type of contact information being sought is the URL of a website, the point of contact may comprise a website set up for the member. For example, in an example embodiment of the invention in which the group for which the invention is being implemented is doctors licensed to practice medicine in the United States, e-mail boxes using a consistent naming convention based on the interface server's URL are created for all doctors in the group, regardless of whether or not a doctor has an

US 7,644,122 B2

11

existing, different e-mail address and without any assistance from or even knowledge of the doctor. In addition, in such an embodiment, websites may also be created for each doctor that contain non-private information about the doctor, such as the doctor's address, credentials, publications, employment history, etc. An example of a website that may be created in one or more embodiments of the invention is shown in FIG. **9**.

The example website of FIG. **9** is a website that may be used in an embodiment of the invention in which the group for which the invention has been implemented is doctors admitted to practice medicine in the United States. The example website of FIG. **9** includes a simple home page **900** that contains background information **910** about the doctor/member (including, in the embodiment of FIG. **9**, the member's created e-mail address), as well as rating information **905**, and control buttons **915**, **920**, **925** and **930**. In the embodiment of FIG. **9**, rating information **905** may be a numerical rating for a member derived from various criteria, including, for example, comments posted by users about the member. In the embodiment of FIG. **9**, a user may post a comment by clicking on "Post Comment" control button **925**. In one or more embodiments, when "Post Comment" control button is activated, a text entry window is displayed that allows the user to enter a comment or otherwise rate the member. The other control buttons of home page **900** of FIG. **9** invoke other actions. "View map" control button **915** displays a map indicating the location of the member's office. "Return to EVERYMD.COM Homepage" control button **930** returns the user to the interface server's home page. "Send E-mail" control button **920** activates a user interface that allows the user to send an e-mail to the member whose home page is currently displayed. In one or more embodiments, if the member for whom the website is being created has an existing website, home page **900** may also contain a link **935** to the member's existing website.

Returning to FIG. **6**, after the new point of contact is created for a member at step **635**, contact information for the newly created point of contact (e.g. e-mail address or website URL) is entered into the contact database at step **640**. In one or more embodiments, the contact information for the created point of contact is stored together with an identifier that identifies the information as relating to a created, as opposed to a pre-existing, point of contact.

At step **650**, a determination is made as to whether there are any additional members of the group for which contact information has not yet been generated. If there are additional members, a next member of the group is selected at step **660**, and the process returns to step **620**. If there are no further members, the process ends at step **655**.

It should be noted that in one or more embodiments of the invention, every member of the group for which the invention is implemented is provided with a website URL and an e-mail address. In one or more embodiments of the invention, website URL's and e-mail addresses are established using a parallel form. For example, in one or more embodiments, e-mail addresses are created in the general form "[first initial] [second initial] [lastname]@interfaceserver.com", and website URL's are established in the general form "[first initial] [second initial] [lastname].interfaceserver.com" (this form of URL, i.e. xxx.xxx.com, is sometimes referred to as a "third level domain name"). For example, for an embodiment in which the group for which the invention is implemented comprises doctors admitted to practice medicine in the U.S., and for which a URL for the interface server is "everymd.com", the e-mail address for a doctor whose name is John H. Smith may be established as "jhsmith@everymd.com" and the corresponding website URL may be established as "jhsmith.everymd.com". The e-mail address and URL are thus virtually identical. The only difference is that in the URL the "@" symbol of the e-mail address is replaced with a

12

period ("."). Establishing URL's and e-mail addresses in this manner provides easy to remember URL/e-mail address pairs. In a more general embodiment, the URL's are established for members of the group in the form "name@subdomain.domain", while e-mail addresses are established in the form "name@subdomain.domain".

FIG. **10** is a block diagram of a computer system that may be used with one or more embodiments of the invention. The computer system of FIG. **10** may be used, for example, as a user computer, interface server computer, or contact data base server in one or more embodiments of the invention. An embodiment of the invention can be implemented as computer software in the form of computer readable code executed on one or more general purpose computers such as computer **1000** illustrated in FIG. **10**, or in the form of bytecode class files executable within a Java™ runtime environment running on such a computer, or in the form of bytecodes running on a processor (or devices enabled to process bytecodes) existing in a distributed environment (e.g., one or more processors on a network). A keyboard **1010** and mouse **1011** are coupled to a system bus **1018**. The keyboard and mouse are for introducing user input to the computer system and communicating that user input to processor **1013**. Other suitable input devices may be used in addition to, or in place of, the mouse **1011** and keyboard **1010**. I/O (input/output) unit **1019** coupled to system bus **1018** represents such I/O elements as a printer, A/V (audio/video) I/O, etc.

Computer **1000** includes a video memory **1014**, main memory **1015** and mass storage **1012**, all coupled to system bus **1018** along with keyboard **1010**, mouse **1011** and processor **1013**. The mass storage **1012** may include both fixed and removable media, such as magnetic, optical or magnetic optical storage systems or any other available mass storage technology. Bus **1018** may contain, for example, thirty-two address lines for addressing video memory **1014** or main memory **1015**. The system bus **1018** also includes, for example, a 64-bit data bus for transferring data between and among the components, such as processor **1013**, main memory **1015**, video memory **1014** and mass storage **1012**. Alternatively, multiplex data/address lines may be used instead of separate data and address lines.

In one embodiment of the invention, the processor **1013** is a microprocessor manufactured by Sun Microsystems, Inc., such as the SPARC™ microprocessor, or a microprocessor manufactured by Motorola, such as the 680X0 processor, or a microprocessor manufactured by Intel, such as the 80X86, or Pentium processor. However, any other suitable microprocessor or microcomputer may be utilized. Main memory **1015** is comprised of dynamic random access memory (DRAM). Video memory **1014** is a dual-ported video random access memory. One port of the video memory **1014** is coupled to video amplifier **1016**. The video amplifier **1016** is used to drive the cathode ray tube (CRT) raster monitor **101.7**. Video amplifier **1016** is well known in the art and may be implemented by any suitable apparatus. This circuitry converts pixel data stored in video memory **1014** to a raster signal suitable for use by monitor **1017**. Monitor **1017** is a type of monitor suitable for displaying graphic images.

Computer **1000** may also include a communication interface **1020** coupled to bus **1018**. Communication interface **1020** provides a two-way data communication coupling via a network link **1021** to a local network **1022**. For example, if communication interface **1020** is an integrated services digital network (ISDN) card or a modem, communication interface **1020** provides a data communication connection to the corresponding type of telephone line, which comprises part of network link **1021**. If communication interface **1020** is a local area network (LAN) card, communication interface **1020** provides a data communication connection via network link **1021** to a compatible LAN. Wireless links are also possible.

US 7,644,122 B2

13

In any such implementation, communication interface **1020** sends and receives electrical, electromagnetic or optical signals which carry digital data streams representing various types of information.

Network link **1021** typically provides data communication through one or more networks to other data devices. For example, network link **1021** may provide a connection through local network **1022** to local server computer **1023** or to data equipment operated by an Internet Service Provider (ISP) **1024**. ISP **1024** in turn provides data communication services through the world wide packet data communication network referred to as the "Internet" **1025**. Local network **1022** and Internet **1025** both use electrical, electromagnetic and/or optical signals to carry digital data streams. The signals through the various networks and the signals on network link **1021** and through communication interface **1020**, which carry the digital data to and from computer **1000**, are exemplary forms of carrier waves transporting the information.

Computer **1000** can send messages and receive data, including program code and HTML code, through the network(s), network link **1021**, and communication interface **1020**. In the Internet example, remote server computer **1026** might transmit a requested code for an application program or HTML code for a requested webpage through Internet **1025**, ISP **1024**, local network **1022** and communication interface **1020**. In accord with the invention, one such downloaded webpage is a user interface provided by the interface server in an embodiment of the invention.

The received code may be executed by processor **1013** as it is received, and/or stored in mass storage **1012**, or other non-volatile storage for later execution. In this manner, computer **1000** may obtain application code in the form of a carrier wave.

Application code may be embodied in any form of computer program product. A computer program product comprises a medium configured to store or transport computer readable code, or in which computer readable code may be embedded. Some examples of computer program products are CD-ROM disks, ROM cards, floppy disks, magnetic tapes, computer hard drives, servers on a network, and carrier waves.

The computer systems described above are for purposes of example only. An embodiment of the invention may be implemented in any type of computer system or programming or processing environment.

Thus, a method, apparatus and business system for providing on-line communications with diverse on-line and off-line recipients has been disclosed. Although the invention has been described using certain specific examples, it will be apparent to those skilled in the art that the invention is not limited to these few examples. For example, although the user interface provided by the interface server has been described as being provided to a user via an internet webpage, the interface may be provided in another form. For example, in one or more embodiments, the interface is provided in the form of a voice mail menu system accessed by a user using a telephone instead of a computer or other internet access device. Further, although certain functions have been described herein as being provided by an interface server computer, those functions may be provided by one or more other devices. Other embodiments utilizing the inventive features of the present invention will be apparent to those skilled in the art.

What is claimed is:

**1**. A method for providing individual online presences for a each of a plurality of members of a group of members by an interface server computer comprising the steps of:

maintaining a database comprising information associated with each of said plurality of members at a database system connected to said interface server computer;

14

allotting individual URLS to each of said plurality of members by associating an individual URL with each individual member of said plurality of members in said database system;

associating an individual home page for each said individual member of said plurality of members with said individual URL allotted to said individual member in said database system, said individual home page comprising information from said database associated with said individual member; a first control for submitting a comment about said individual member; and a second control separate from said first control for sending a message other than said comment to said individual member;

receiving by said interface server an online request for said individual URL from a requesting source;

providing said individual home page by said interface server computer to said requesting source.

**2**. The method of claim **1** further comprising the step of providing by said interface server computer a message entry interface in response to activation of said second control.

**3**. The method of claim **1** further comprising the step of providing by said interface server computer a comment entry interface in response to activation of said first control.

**4**. The method of claim **1** wherein said individual home page further comprises a link to an existing website of said individual member.

**5**. The method of claim **1** wherein said individual home page further comprises rating information associated with said individual member.

**6**. The method of claim **1** wherein said individual home page further comprises a control for submitting rating information for said individual member.

**7**. The method of claim **1** further comprising the step of providing a rating entry interface by said interface server computer in response to activation of a control of said individual home page.

**8**. The method of claim **2** further comprising the step of receiving by said interface server computer a message entered into said message entry interface.

**9**. The method of claim **3** further comprising the step of receiving by said interface server computer a comment entered into said comment entry interface.

**10**. The method of claim **9** further comprising the step of displaying by said interface server computer a rating comprising said comment on said individual home page.

**11**. The method of claim **7** further comprising the step of receiving by said interface server computer rating information entered into said rating entry interface.

**12**. The method of claim **8** further comprising the step of sending by said interface server computer a message to an existing e-mail address for said individual member in response to receiving said message entered into said message entry interface.

**13**. The method of claim **8** further comprising the step of sending by said interface server computer a reply message to a sender of said message entered into said message entry area.

**14**. The method of claim **13** wherein said step of sending a reply message by said interface server computer to said sender comprises sending a message to an e-mail address created for said sender.

**15**. The method of claim **1** further comprising the step of displaying rating information for said individual member by said interface server computer on said individual home page.

\* \* \* \* \*

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

May 23, 2014

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
    (by email or CM/ECF)

Frank Michael Weyer

/s/Frank Michael Weyer

Name of Counsel                    Signature of Counsel

Law Firm  TECHCOASTLAW

Address  2032 Whitley Ave

City, State, ZIP  Los Angeles CA 90068

Telephone Number  310-494-6616

FAX Number  310-494-9089

E-mail Address  fweyer@techcoastlaw.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

# <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the word count of this brief, excluding the portions

set forth in Federal Rules of Appellate Procedure 32(a)(7)(B) and Federal

Circuit Rule 32(b), according to the word count tool of Microsoft Word, is

6,218 words.


Dated: May 23, 2014          <u>/s/ Frank Michael Weyer</u>
                             Frank Michael Weyer
                             (CA State Bar No. 127011)
                             TECHCOASTLAW
                             2032 Whitley Ave
                             Los Angeles CA 90068
                             fweyer@techcoastlaw.com
                             Phone (310) 494-6616,  Fax (310) 494-9089
                             Attorney for Appellants Weyer and Javaher